The allegations of the complaint and the evidence on the part of plaintiff were to the effect: That on or about 28 February, 1929, plaintiffs made a contract with defendant, a Delaware corporation, through certain of its agents, whereby the plaintiff became the sole representative and distributor of the defendant's soap products in certain territory comprising five counties (Craven, Onslow, Jones, Pamlico and Carteret) in North Carolina. The said contract contained certain conditions and agreements, among which were: That the defendant contracted and agreed that plaintiffs should be the sole representatives or distributors of its goods in said territory; that defendant would not sell its products to local or retail trade except for the account of plaintiffs, all of such orders or sales to be filled from the warehouse of plaintiffs; that defendant would furnish a local salesman to work and contact the retail trade in said territory, making sales for the account of plaintiffs and shipments to be made from plaintiffs' warehouse in New Bern; that the defendant would protect plaintiffs on all declines in prices of said goods so that the margin of profit provided in the contract might be available to plaintiffs on all retail sales between the wholesale prices and retail prices; that the contract should extend for an indefinite period of time and so long as the contractual relations were satisfactory, and in the event it should be desired to discontinue the contract, that proper notice would be given plaintiffs by the defendant and that the defendant would relieve plaintiffs of all goods on hand or give shipping orders for such *Page 311 
goods at the time of the termination of the contract. The relations in said contract extended for more than one year, that is, February, 1929, to April, 1930, with full compliance of all the terms and conditions on the part of both the plaintiffs and defendant. In April, 1930, the defendant, without notice, breached its contract with plaintiffs and began soliciting local trade and retail merchants and making sales and delivery of its soap products from its own warehouse in direct competition with plaintiffs, and by selling its goods at a retail price for less than the wholesale price which they had required the plaintiffs to pay for said goods then in the warehouse of plaintiffs, and that upon the discovery by the plaintiffs of that fact, they immediately requested that the defendant relieve them of the stock of goods then on hand in the warehouse of plaintiffs of the total value of over $6,256.66, which the defendant failed and refused to do, thus forcing the plaintiffs to dispose of said stock of goods on a competitive basis which the defendant was offering to the other trade in the territory and causing them to suffer great loss and damage in the sum of $3,132.83. The answer of the defendant denied the alleged contract and the alleged breach.
The testimony of plaintiff, Raymond Maxwell, was to the effect that for several months prior to the contract McKenzie "had been selling Proctor and Gamble goods to local merchants about over the territory. . . . And about the 10th or 12th of February, 1929, he came in and said his wholesale distributor in New Bern was going out of business or had gone out of business; he said that they had been handling all of his wholesale orders for him and that he had to get a wholesale distributor in New Bern to take care of this territory, and they couldn't take care of the territory satisfactorily any other way, and that he wanted us to buy their goods in carload lots and take care of the orders for the retail trade on their regular list prices. . . . He said that his company would never go direct to the retail trade any more, that they had decided that the proper way to distribute their goods was through wholesale merchants who bought in carload lots and that if we would buy their goods in carload lots that they would guarantee to move every case of their goods that we purchased at their regular list price and that at any time that we had their goods in our stock and there should come a decline in the prices of their goods that the goods would be reported and that the company would issue credit memorandum for the amount of their decline. . . . McKenzie brought with him Klettner and introduced him as Proctor and Gamble's representative. We discussed the profits that we would have with Mr. McKenzie and Mr. Klettner at that time. . . . It was understood at that time, if the terms of the contract were changed as to terminating the contract with us, they guaranteed to move every case we bought at their regular list *Page 312 
price; after we had this agreement with Mr. Klettner and Mr. McKenzie we bought a carload of their goods, or gave them specifications for a carload of their goods on this occasion that we are talking about. . . . The shipment was billed from Proctor and Gamble Distributing Company. . . . The date of the invoice is 28 February, the invoice and bill showing $2,508.97, is marked paid. . . . After we received the shipment, the first carload shipment, we received a communication from the Proctor and Gamble Company of Atlanta, through the mail, which was an itemized invoice for the order given to Klettner and McKenzie. Also a letter of 20 May, 1929, from the Proctor and Gamble Distributing Company, Atlanta, Ga., addressed "To all Distributors: Crisco Merchandising Allowance." Among other "puffing" statements is the following: "We believe the present time is an opportune one for your men to get extra heavy volume on Crisco and we trust you will do everything possible to take advantage of this offer while it is in effect. We feel sure your trade will do well to buy freely — advertise and push it to the consuming trade, in order to develop a greater business on this outstanding product — Crisco."
Within about fourteen months period of the alleged contract, before the alleged breach, plaintiffs ordered about eight cars of soap and soap products from defendant. The total invoice of the cars purchased from defendant during the period of the alleged contract amounted to $24,230, and when the alleged breach took place plaintiffs' stock on hand amounted to $6,256.66. The relationship continued from February, 1929, to April, 1930.
The witness, Raymond Maxwell, further testified: "Q. Then during that time what did Proctor and Gamble do in connection with handling the goods in your warehouse and having you to sell and the general distributing? A. Why, he was complying with the terms of our agreement by turning his orders over to us to be filled from our stock. Mr. McKenzie was the salesman here filling the orders through our stock, turning the orders over to us to be filled by us. . . . We figured our average profit, and it was running about seven per cent over and above the cost of the goods. . . . About 16 April, 1930, Mr. McKenzie called on us and informed us that he had instructions from his company to pool a car of their products to our retail customers. . . . Q. What does he mean by pooling a car? A. Sell a car of their products direct to the retail dealers of the territory that we covered and on which we had an agreement. . . . Upon receipt of this information we talked about it for some time and told Mr. McKenzie that they were breaking their agreement with us. . . . At the time Mr. McKenzie informed us that he was going to sell our retail trade in our territory direct; then we told him we wanted him to move our stock, and he said *Page 313 
he would have to take that up with the company; he said he would do what he could about it, but he would rather we would take it up direct, so we wired the company direct; we called him down to the office that night of 16 April and prepared a wire to the company which he read and which he agreed was correct."
The telegram to defendant at Atlanta, Ga., charging a violation of contract stated "As the terms of this agreement have been violated please give us disposition this stock immediately." After sending the telegram Mr. Stone, of the Atlanta office, called plaintiffs over long-distance phone. A letter of 21 April, 1930, in consequence of interview with Stone was sent to defendant "Atten: Mr. Stone," and read: "Complying with your request in conversation with the writer on the telephone today, we beg to advise that our present stock of your goods is as follows: (setting same forth). We will thank you to give us disposition of this stock in accordance with our wire of the 16th to your Mr. S. R. Kane."
Again plaintiffs wrote a letter, 2 May, 1930: "In response to your request on telephone on the 21st (April) we immediately sent you an itemized list of your products by letter on that date, and to date we have not received disposition of the car of your products which your representative sold the retailers of this city. You promised the writer that you would fill these orders promptly out of our stock, and we will thank you to let us have disposition at once."
Plaintiff further testified: "The Proctor and Gamble Company protected us on every decline in price of their goods during the time that we continued under their contract arrangement. . . . Q. What information did you have, if any, relative to the decline of the Proctor and Gamble goods from the time that they breached the contract until the present time? A. Proctor and Gamble's price list."
Plaintiffs offered in evidence price list of defendants, dated 1 July, 1930: "This price list supersedes all previous lists." Plaintiffs also offered in evidence, another price list published by Proctor and Gamble Distributing Company: "This price list supersedes all previous lists. . . . Orders should be given to our salesmen or be mailed or telephoned direct to the Proctor and Gamble Distributing Company. . . . Prices subject to change without notice. . . ."
Plaintiff, Raymond Maxwell, further testified: "Q. Mr. Maxwell how did you get the price list from the Proctor and Gamble Distributing Company after the breach by them? A. Proctor and Gamble Distributing Company quit sending us a price list, and so in disposing of those goods we had on hand, which we were bending every effort to get rid of, we would find out that the price of goods had declined, and we would get the Proctor and Gamble price list. The price list introduced here in *Page 314 
evidence were Proctor and Gamble's price lists; we could get these lists from time to time; we had to meet the competitive prices of Proctor and Gamble to dispose of these goods; we met the prices of Proctor and Gamble and sometimes sold them lower than that to get rid of them; we made every effort to dispose of the goods to our customers since the company would not relieve us of them; we still have some goods on hand; we have been working over these goods since 16 April, 1930; this is October, about thirty months or two and a half years; we ascertain the loss from the sale of goods from our warehouse meeting the prices of the Proctor and Gamble price list. . . . I was furnished a price list regularly by Proctor and Gamble between February, 1929, and April, 1930. . . . While he (Mr. McKenzie) was working under this contract and agreement he came in every week practically; our stockman took the stock. Mr. McKenzie didn't take it; I don't know that Mr. McKenzie knew where we kept our stock; in April he came in and told me he was going to pool a car and thereupon I called upon Proctor and Gamble to give me shipping orders for my 1,300 cases; this was on 16 April, 1930; that is what I allege to be a breach of the contract; when they broke the contract and went direct to the retail trade, we asked them to relieve us of our stock; the pooling of the car was a breach of the contract; I don't know when they pooled the car, but he told me on 16 April, 1930, that he was pooling it. At that time I declared the contract breached and declared a cancellation and sent that telegram on 16 April. . . . Q. Were those the two men you made your contract with? A. Yes, sir. Q. Now, Mr. Guion asked you whether the 205 cases ordered by you at that time were in a pooled order. Now state why you ordered the goods at that time from Mr. McKenzie in a pooled car shipment? A. Why, we ordered those goods because we couldn't find anything in this State belonging to Proctor and Gamble which we could attach to protect us against the loss we had sustained, therefore, it was necessary to get some goods to attach and, therefore, we ordered the goods bill of lading, sight draft attached and, therefore, we ordered these goods. Q. That was the only way you could get jurisdiction? A. Absolutely. . . . Proctor and Gamble were a nonresident corporation. . . . We bought and paid for approximately $24,230 worth of their goods between February, 1929, and April, 1930; we had just a small quantity of the shipment of June, 1928, when we made the contract; we couldn't have sold $6,256.66 worth of goods at the time this contract was breached if we could have put it up and sold it in a lump sum; couldn't have sold it for very much."
Harold Maxwell corroborated Raymond Maxwell's testimony, and testified, in part: "Q. What, if anything, did he (Klettner) say that he would do about any goods that was on his hands? A. And that he would *Page 315 
guarantee to move every case of stuff that we bought on a profit to Maxwell and Company. Q. Now, in accordance with that conversation, was an order placed with Mr. McKenzie? A. Yes, sir, we gave Mr. Klettner and Mr. McKenzie an order that night. Court: That was the night of 20 February; 20 February, I believe was the date. Q. February of what year? A. 1929. Court: Is that the time that you gentlemen say the contract was made? A. That's the day the contract was really made, judge. They talked about the car way before that, but that had nothing to do with this contract. . . . And he (McKenzie) met us there at eight o'clock and we sent this telegram that was brought in court here today; after that Mr. Raymond Maxwell talked to Mr. Stone, in Atlanta, and after that we wrote a letter dated 21 April to Proctor and Gamble Company; the damage sustained by Maxwell Company by reason of the breach of this contract and failure to remove these goods off our hands was figured at $1,024.69 besides the other things we can't figure; the trouble we had had before was years ago. . . . Q. Now, Mr. Maxwell, you tell his Honor and the jury what was the fair, reasonable market value of those goods left on the hands of Mr. Maxwell at the time of the breach, in the place and in the condition they were left on his hands? A. If they were put up in bulk and sold they wouldn't have brought three thousand dollars. Q. Is that in your opinion a fair market value of the goods in the condition they were left in your hands? A. $3,000 bulk, yes, sir."
Raymond Maxwell, recalled, testified: "Q. Will you tell his Honor and the jury what the fair market price of those goods, sold in bulk, was, sold on this market if you had to get rid of them at that time? A. It would be $3,132.83. I didn't know of anybody buying it that way then; I think if you put those goods on the market here at that time it would not bring more than half price; this is based on if put up and sold as a whole here. . . . I never knew a general store to buy retail here; the business here since 1929, has been a decrease in the value and volume of the commodities sold."
The issues submitted to the jury and their answers thereto, were as follows:
"1. Did the plaintiffs and the defendant contract, as alleged in the complaint? Answer: Yes.
2. Did the defendant breach the contract, as alleged in the complaint, during April, 1930? Answer: Yes.
3. Did plaintiff waive breach of contract as alleged in answer? Answer: No.
4. What damages, if any, has plaintiff sustained by reason of the breach of the contract, as alleged in the complaint? Answer: $2,000." *Page 316 
The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The necessary assignments of error to determine the controversy will be set forth in the opinion.
The defendant introduced no evidence and at the close of plaintiffs' evidence made a motion for judgment as in case of nonsuit. C. S., 567. The court overruled the motion and in this we can see no error.
The defendant contends that "The termination of this motion must depend upon the competency of plaintiffs' evidence to establish (a) contract; and (b) its breach." Defendant also contends: "That there was no competent evidence offered of the contract. The whole evidence offered by the plaintiffs is to the acts and declarations of the alleged agent, without proof aliunde of agency."
We think from the direct and circumstantial evidence introduced by plaintiffs that it was sufficient to show that Mr. Klettner and Mr. McKenzie made the contract with the plaintiffs, as is alleged by them, on behalf of defendant corporation, and that the defendant breached it. That the defendant at its Atlanta branch carried out all the terms and agreements made with plaintiffs by Klettner and McKenzie, and there was evidence of ratification. The ear-marks of agency, ratification, breach, etc., are set forth in the above evidence of plaintiffs.
It was in evidence that McKenzie and Klettner, whom plaintiffs contended they made the contract with, were in the courtroom at the trial of this action. "Q. Were those the two men you made your contract with? Answer: Yes, sir."
This is a civil action. These men did not go on the stand and deny as to what plaintiffs testified was the contract made by them on behalf of the defendant company. There was evidence introduced later to show the agencyaliunde.
In Walker v. Walker, 201 N.C. at p. 184, we find: "Whether the charge was true or not, the falsity of it was peculiarly within the defendant's knowledge. The fact that she did not refute the damaging charge made by plaintiff, it may be that this was a silent admission of the charge made against her. In Hudson v. Jordan, 108 N.C. at p. 13, the party's failure to testify was regarded as a `pregnant circumstance.' Powell v. Strickland, 163 N.C. at p. 402; In re Hinton, 180 N.C. at p. 213." In re Will ofBeale, 202 N.C. 623.
The manner and time in which the evidence aliunde as to agency may be introduced, is largely in the discretion of the court below. *Page 317 
In N.C. Handbook of Evidence (Lockhart), 2d ed., sec. 154, at pp. 187-8, citing numerous authorities, is the following: "Admissions by agents, made while doing acts within the scope of the agency, and relating to the business in hand, are admissible against the principal, but such admissions are not admissible to prove the agency; the agency must be shownaliunde before the agent's admissions will be received. It seems that the judge in his discretion might allow the admissions to be introduced conditionally before the agency was proved, the party introducing the admissions promising to prove the agency afterwards, and it being understood that unless the agency was proved, the admissions would be stricken out. But admissions by an agent, made subsequent to the completion of the transaction to which they relate, are not admissible against the principal, even though the agent continued to act for the same principal in other matters. The declarations and admissions of the agents of corporations are governed by the same principles which apply to the agents of individuals." Buckner v. C. I. T. Corp., 198 N.C. at p. 699; CreditCo. v. Greenhill, 201 N.C. at p. 612.
In Acceptance Corp. v. Fletcher, 202 N.C. at p. 172, is the following: "In these cases it is held that where there is evidence tending to show that an alleged agent has repeatedly collected money upon debts owed to the alleged principal, and the alleged principal has received the money collected by the alleged agent, and applied the same as payments on his debts, the inference is permissible that an agreement to that effect has been made by and between them, and that the evidence is sufficient to make out a prima facie case of agency." Bobbitt v. Land Co., 191 N.C. at p. 328; Atkinson v. Harvester Co., 191 N.C. 291; Sears, Roebuck Co. v.Banking Co., 191 N.C. at p. 505; Bank v. Sklut, 198 N.C. 589; Buchananv. Carolina Stores, Inc., 200 N.C. 792.
In Bobbitt v. Land Co., supra, at p. 328, is the following: "Hoke, J., in Powell v. Lumber Co., 168 N.C. p. 635, speaking to the question, says: `A general agent is said to be one who is authorized to act for his principal in all matters concerning a particular business or employment of a particular nature. Tiffany on Agency, p. 191. And it is the recognized rule that such an agent may usually bind his principal as to all acts within the scope of his agency, including not only the authority actually conferred, but such as is usually `confided to an agent employed to transact the business which is given him to do,' and it is held that, as to third persons, this real and apparent authority is one and the same, and may not be restricted by special or private instructions of the principal unless the limitations sought to be placed upon it are known to such persons or the act or power in question is of such an unusual character as to put a man of reasonable business prudence upon inquiry as to the existence of the particular authority *Page 318 
claimed (citing authorities). The power of an agent, then, to bind his principal may include not only the authority actually conferred, but the authority implied as usual and necessary to the proper performance of the work intrusted to him, and it may be further extended by reason of acts indicating authority which the principal has approved or knowingly, or, at times, even negligently permitted the agent to do in the course of his employment," citing authorities.
In Parks v. Trust Co., 195 N.C. at pp. 455 and 456: "Speaking to the subject in Waggoner v. Publishing Co., 190 N.C. 829, 130 S.E. 609, it was said: `The defendant will not be permitted to repudiate the act of its agent as being beyond the scope of his authority, and at the same time accept the benefits arising from what he has done while acting in its behalf. Starkweather v. Gravely, 187 N.C. 526. It is a rule too well established to admit of debate that if a principal, with full knowledge of the material facts, takes and retains the benefits of an unauthorized act of his agent, he thereby ratifies such act, and with the benefits he must necessarily accept the burdens incident thereto or which naturally result therefrom. The substance of ratification is confirmation after conduct. 2 C. J., 467. It is also a settled principle of ratification that the principal must ratify the whole of his agent's unauthorized act or not at all. He cannot accept its benefits and repudiate its burdens. Bank v.Justice, 157 N.C. p. 375.'" Lawson v. Bank, 203 N.C. 368.
In regard to the question of the discrepancies in the plaintiffs' testimony in regard to damage, this was a matter for the jury to determine.
In Collett v. R. R., 198 N.C. at p. 762, citing numerous authorities, speaking to the subject, it is said: "Indeed, it cannot be denied that there are inconsistencies, if not direct conflicts, in the testimony of one or two witnesses introduced by the plaintiff. But while these apparent inconsistencies may have affected the credibility of the witness they would not have justified the withdrawal of their testimony from the jury. This principle is maintained in a number of our cases."
On the measure of damages, the court below charged the jury: "The court instructs you that the rule for the assessment of damages in a case like this is the difference between the contract price and the fair market value of the goods at the time of the alleged breach. . . . Our court has said in a number of cases, and I am quoting now, gentlemen, from a case in 196 N.C.McCall v. Lumber Company (at p. 603): `That where the contract,' as in this case, `is broken before the arrival of the time for full performance and the opposite party elects to consider it in that light, the market price on that day of the breach is to govern in the assessment of the damage. The damages are to be settled and ascertained according to the existing state of the market at the time the cause of action arose, and not at the time fixed for the full performance.'" *Page 319 
In Monger v. Lutterloh, 195 N.C. at p. 279, citing numerous authorities, it is said: "The rule is too firmly embedded in our jurisprudence to need repeating, that ordinarily the amount of loss which a party to a contract would naturally and probably suffer from its nonperformance, and which was reasonably within the minds of the parties at the time of its making, including such special damages as may be said to arise directly from circumstances existent to the knowledge of the parties, and with reference to which the contract was made, is the measure of damages for the breach of said contract. Causey v. Davis, 185 N.C. 155,116 S.E. 401. Such was the rule laid down in the celebrated case ofHadley v. Baxendale, 9 Exch., 341, and this case has been consistently followed by us."
The defendant tendered the third issue as set out in the record, and the court submitted this as follows: "Did the plaintiffs waive breach of contract as alleged in answer?" This was premised on the evidence of the "pooling car" shipment. We see no error in the charge of the court below on this aspect. The defendant in its prayers for instructions submitted no prayer in regard to the measure of damage. If it desired more specific instructions, it is well settled that a prayer on this aspect should have been requested.
The defendant strenuously contends in many of its exceptions and assignments of error as to the charge, that the court below failed to declare and explain the law arising on the facts. With no evidence introduced by the defendant and only two witnesses for the plaintiffs, the court's charge comprised 21 pages, as shown by the record. It is complete as to the law on every aspect and carefully prepared, it did not impinge on C. S., 564. It gave the contentions of both sides.
In Davis v. Long, 189 N.C. at p. 137, we find: "In Simmons v.Davenport, 140 N.C. p. 410, Walker, J., said: `In the absence of any such request, we cannot say that it was reversible error for the court to have charged in the general terms employed by it, especially in a case like this one, which involves so little complication that a jury could not well have misunderstood the legal aspect of the matter. If a party desires fuller or more specific instructions, he must ask for them and not wait until the verdict has gone against him and then, for the first time, complain of the charge," citing authorities.
The case was a simple one, both as to law and facts, and the contentions could be easily understood by the jury. It was mainly questions of fact for the jury to determine. Because after stating the contentions the court below did not then make a direct charge on that particular aspect, we cannot hold it prejudicial or reversible error.
This action is typical of what is said in Foster v. Allison Corp., 191 N.C. at p. 172: "State courts are enforcing contracts by foreign *Page 320 
claimants against its own citizens and corporations as it should do, but when the citizen has a suit against a foreign corporation or person, and it has no property in the State, the claim is frequently lost. If the foreign corporation or person has an agent, the cry or defense is frequently no authority or ultra vires. There should be no favorites." In the judgment of the court below, we find
No error.