This action was brought to recover $1,500 as damages for an alleged breach of contract to sell and deliver to the plaintiffs at Norfolk, Va., f. o. b., 350 barrels of motor gasoline, the balance of the entire lot of 500 barrels called for by the original contract. It is alleged that the contract was made through one C. C. Clark, agent of the defendants, and the price was 8 1/2 cents per gallon. Defendants refused to ship the oil, and deny that any such contract was ever made. Plaintiffs put in evidence a written contract, signed by them and C. C. Clark, salesman, dated 19 August, 1911. It appears that this contract was not really made on the day of its date, but in the latter part of October, 1911, and dated back to 19 August, 1911, for the reason that the agent of defendants, C. C. Clark, had been forbidden by them to make any contracts after 19 August, 1911, for the sale of gasoline at 8 1/2 cents per gallon, the price of gasoline having advanced rapidly at the time the paper was signed in October and was still advancing, the price in October being 9 1/2 cents per gallon. The contract was as follows:
(612) THE TEXAS COMPANY
Ship to C. E. Wise Bro., Stumpy Point. When ship: As required. Route............................................ Freight allowance to..................................... Terms, 30 days. 500 barrels motor gasoline @ 8 1/2 cents, f. o. b. Norfolk.
In purchasing the above quantity it is the intention of the purchaser to cover his entire requirements for one year from date. If, however, purchaser shall be unable to use the entire quantity during the period indicated, the seller may cancel unused balance or extend period of delivery. C. C. CLARK, Accepted: Salesman. C. E. WISE BRO., Purchasers.
Clark inclosed the contract to plaintiffs in a letter suggesting that they remit some money to keep the company in better humor.
E. F. Wise testified in part: "We had a contract with the Texas Company about some oil. (The contract is in writing, and it is shown *Page 531 
witness; it is signed by `C. E. Wise Brother.') I did it; the name `C. C. Clark, salesman,' was written by C. C. Clark; I know him; I saw him here to-day; he is here. I had dealings with him, buying oil from him, etc. I went over to the Texas office; I have been dealing with the Texas Company, through Mr. Clark, nearly a year. I know where the Texas Company's office is in Elizabeth City. Mr. C. C. Clark is in that office, acting for the company; he is the man who signed this paper, and was in the office of the Texas Oil Company in Elizabeth City when he signed the contract. We went to see him some time toward the latter part of October, 1911; Mr. Clark was in the office."
Q. What was said by you and him about entering into this contract at that time? A. He said that the company had quit accepting contracts after the 19th of August.
Q. What else? A. He said that by dating it back he thought (613) that the company might accept it. He filed out the contract and signed and passed it to me and I signed it.
Q. What did you and he agree to do about it? A. He said that he was not positive that it would go through, but that he would send it to the Norfolk office and find out, and if it was accepted there it was all right.
Q. Anything else said? A. No, sir. I left and went home and he signed the contract; he sent a letter with it, and I have it with me. It was about a week after Clark signed the contract before I received the contract through mail. . . . After looking at the letters and so on, I am willing to withdraw the statement positively that it was in November. It was in the latter part of October. I was in Elizabeth City when I made this arrangement with Clark. I didn't date it back to August 19th; I haven't anything to do with that part of it.
Q. Didn't he tell you that he could not make the contract unless he dated it back? A. He told me that; yes, sir; but I didn't have anything to do with that part of it. Mr. Clark didn't tell me that he could make the contract; he said that the company had notified him not to accept any more contracts, but that was his own business and not mine. He then said he would send it to the office; I don't know whether oil had gone up at that time as much as a cent; it was worth 9 or 9 1/2 cents; he told me he would rather we sign a contract; that several others had signed it, and he would rather we would. I stated when I was on the stand before as follows: "Q. Why did he say he wanted it dated back to August 19th? A. Because that was the time the time expired for accepting contracts; the company would not accept any more after that date." That was my answer; as a matter of fact, he didn't tell me that the company would not accept any more. *Page 532 
Q. You did testify to that before? A. I testified to that, but he must have known it by accepting it. He told me that the company would not accept any more after that date; he stated that he was not sure he could get it through, but that he would send it to the Norfolk office and see if he could get it accepted. When I got this contract, Mr. Clark (614) told me he had instructions from the company not to take the contract, and it was dated back so that the company would furnish the oil. He told me the oil was going up, and that he received a wire not to make any more contracts at that price, and the only way he could make the contract was to date it back, and I agreed to take it with that understanding; that proposal was made to me by him.
Q. Wasn't that a fact? A. Yes, sir; most of it was. He told me that the company had refused to accept the contract; he made the proposal to me to get this contract through; he presented the contract to me and said that the company had notified him not to take any more contracts, but that he thought he could get it through. I said to him, if he could get it through I would take the risk of the oil going up or down.
The following is a part of the testimony of E. F. Wise, one of the plaintiffs, on a former trial of this case at July Term, 1913:
Q. Then, did you get this under the contract? A. It must have been so.
Q. Then your contract was made before October 14th, wasn't it? A. I don't think so.
Q. Will you explain to the court and jury how you got that 8 1/2 cents October 14th, if it wasn't under the contract? A. I don't know the exact date our contract was signed; I judged it to be in November.
Q. I am asking you to state whether or not this was under the contract? A. It must have been under the contract.
Q. Then, according to that, the contract was made before October 14th? A. Yes, sir.
Q. When you got this contract, Mr. Clark told you that he had instructions from the company not to make the contract, didn't he; and you had it dated back so that the company would furnish the oil? A. Yes, sir; he dated it back and told me about it. He told me that oil was going up and he had received a wire not to make any more contracts at that price, and that the only way he could make the contract was to date it back, and I agreed to take it with that understanding.
(615) Q. When he agreed to that, then he signed the paper? A. I signed it and he signed it also.
Q. So, then, at the time the contract was made, oil had gone up how much? A. It seems to me it was about 9 cents. *Page 533 
Q. And the only way he could get that to you was to date the contract back? (Plaintiffs object; objection overruled, and the plaintiffs except.) A. That was the only way to get it through, so he said.
The defendant alleged and offered evidence to show that C. C. Clark had no authority to make the contract, but had been forbidden to do so, and that they would not have shipped any oil to plaintiffs under the terms of the paper had it been known at the time that the contract had been antedated in order to deceive them and produce the impression upon them, which was done, that the contract was correctly dated and they were bound to ship the oil, as it was not forbidden by the special instructions given to Clark by the defendant.
On this part of the case, and with reference to the orders for oil sent in by plaintiffs, W. Thompson testified: "On 14 October, 1911, an invoice was sent to us, showing a delivery to C. E. Wise Bro. at 8 1/2 cents a gallon, which was 1 cent lower than prices were at that time; it was not in accordance with our prices; it was sent in for approval, but was not approved, and I refused to approve it and held the invoice up and would not allow them to enter it on our books, and I asked Mr. Clark why he had done so. He said he had a contract with C. E. Wise; I said, `We have no record of it'; he said, `It ought to have been sent to you.' A short time after that he sent what purported to be a contract in; when it came it bore date of `19 August, 1911.' I took the contract in faith that it was made on the date shown. I first learned last term of court about its being dated back by hearing the testimony of Mr. Wise on the stand. Oil was worth, when the contract was sent in by Mr. Clark, 9 1/2 cents f. o. b. Norfolk, wholesale. The oil would not have been delivered if I had known it had been dated back; I would not have sent any if I had known it was made in October instead of August. There were 79 barrels shipped; the company made contracts at this time, from 1 May, 1911, to 19 August, 1911; on 19 August, (616) 1911, our instructions to our salesmen were to increase their price 1 cent a gallon, and to take no more contracts; I sent him instructions by telegram and called him up over the phone; I have not the letter; I do not think we have been able to find it; we found a letter of 23 August, asking that Mr. Clark acknowledge receipt of our instructions; I instructed him to discontinue making contracts, to increase the price 1 cent a gallon, making 9 1/2 cents f. o. b. Norfolk instead of 8 1/2 cents. . . . We got this order the latter part of October or the first part of November."
Q. Do you remember the first time you ever saw it? A. I cannot say that I do — that particular order. I remember its coming in; it came in the regular course of mail or was handed me by Mr. C. Clark; I do *Page 534 
not open the mail myself; the mail is brought in to me after it has been opened; I remember its arrival in the Norfolk office, and I say again that it came in my mail or was handed to me by Mr. Clark, I do not know which.
Q. Who handed it to you personally? A. I cannot say that.
Q. Was there anything else with it? A. I do not think there was. I do not remember that there was anything else with it. I took it, looked at it, and I saw it was dated 19 August; I had previously said something to Clark about it.
Q. Did he say anything about it to you? A. Not until I took the matter up with him.
Q. Did you take it up personally with him? A. Yes, sir.
Q. Did you get it? A. Yes, sir.
Q. He told you he had it? A. He did.
Q. It came in and you filled it? A. It came in the usual course of business and I filled it, thinking it was made on 19 August; Clark gave me the impression that it was a bona fide order. Mr. Clark informed me that he had this contract with C. E. Wise. We sent all the oil that was shipped during the year under this contract. I was in the Norfolk office when Mr. Clark and I had that conversation. When I asked Clark about the invoice which had been sent in on 14 October, he (617) told me he had a contract with Wise, and I told him that we had no such record; he informed me that we ought to have. I accepted order with understanding it had been made on 19 August, 1911; never heard of contract being dated back until the testimony of Mr. Wise.
The following list shows deliveries of oil by defendants to plaintiffs in and after October, 1911:
1911.
Oct. 14. 5 iron barrels, 267 gals.
Nov. 1. 5 iron barrels, 267 gals.
Dec. 14. 6 iron barrels, 316 gals.
1912.
Feb. 1. 10 iron barrels, 530 gals.
Mar. 1. 6 iron barrels, 310 gals.
Apr. 4. 10 iron barrels, 536 gals.
Apr. 13. 4 iron barrels, 218 gals.
May 11. 10 iron barrels, 533 gals.
June. 21. 14 iron barrels, 757 gals.
Aug. 6. bulk, 10 gals.
Aug. 9. 9 iron barrels, 481 gals. *Page 535 
The total deliveries amounted to 79 barrels during that period. On 5 August, 1912, the plaintiffs, supposing that they had received 150 instead of 79 barrels, demanded the delivery of the remaining 350 barrels. This was about two weeks before the contract expired. Defendants, believing still the contract had been correctly dated and was binding upon them, offered to let them have 100 more barrels, but this offer was thereupon refused. There was evidence that plaintiffs sold some of the oil they received from defendants under the alleged contract at 4 1/2 cents less than the market price. They explained this by saying that they did not want to have more than they could handle, and that it sold for less at wholesale than retail; but the court charged that they were not entitled under the contract, if valid, to sell it wholesale, as they were engaged in the retail trade, and the oil demanded for that purpose the judge directed to be excluded from the estimate of damages.
The defendants requested the court to nonsuit the plaintiffs, (618) and to charge that there was no legal ratification of the unauthorized act of C. C. Clark, as agent, unless defendants acted with full knowledge of the real facts and as to the true date of the contract. There were also requests upon the measure of damages, which are not material, in our view of the case. These requests for instructions were denied by the court.
Judgment was entered upon the verdict, and defendants appealed.
After stating the facts: This case, in one material aspect of it, turns upon the point whether there is any evidence of ratification by defendants of the unauthorized act of its agent, in contracting for them to sell the gasoline below the market price, and in positive violation of express instructions not to do so. In order to decide this question, we must consider the evidence in the most favorable light for the plaintiffs; but when it is thus viewed, we are of the opinion there was no ratification, and the nonsuit should have been granted.
We start out with the fact admitted that the plaintiffs knew, when the contract was made, that C. C. Clark, the agent, had no authority to make it in behalf of his principal. He so stated to them, and told them of his recent instructions, and they knew well why the defendants had withdrawn the authority to sell from him, because the price of gasoline was rapidly advancing, having risen to a point quite a full cent per gallon over the price mentioned in the alleged contract, and still advancing, and reaching within the ensuing year a price nearly double *Page 536 
that at which they proposed to buy. The contract was made under very suspicious circumstances, sufficient to warrant the inference, or even to produce the conviction, that it was intended to deceive the defendants and to induce them, unsuspectingly, to believe that their agent had made the contract at a time when he was authorized to do so, by antedating it and making it appear, on its face, to be within his authority as (619) agent, and, therefore, valid as against the defendants. The entire evidence shows that defendants were, at the time, and remained ignorant of the real nature of the transaction, and that, believing it to be regular in all respects and to have been made on the day of its date, they naturally concluded that they were bound by it, and for that reason shipped 79 barrels of gasoline, from time to time, upon the orders of the plaintiffs. "No doctrine is better settled, both upon principle and authority, than this: that the ratification of an act of an agent previously unauthorized must, in order to bind the principal, be with full knowledge of all the material facts. If the material facts be either suppressed or unknown, the ratification is treated as invalid, because founded on mistake or fraud." I Clark Sykes on Agency (1905), sec. 106;Owings v. Hull, 9 Peters (U.S.), 607 (9 L.Ed., 246); Mechem on Agency (1889), sec. 129; Reinhardt on Agency (1902), sec. 109. The rule has been thus stated: "Unless the party undertaking to ratify knew that he was not liable without such ratification, he will not be bound." P. S.R. R. v. Gazzam, 32 Pa. St., 340; Reinhardt on Agency, supra. 31 Cyc., 1253, states the rule in this way: "In order that a ratification of an unauthorized act or transaction of an agent may be valid and binding, it is essential that the principal have full knowledge, at the time of the ratification, of all material facts relative to the unauthorized transaction. And in order to make this rule operative, the principal must know the actual facts and not merely what the agent supposed were the facts. If the material facts have been suppressed or are unknown, there is no ratification, and the principal is at liberty to repudiate his assent and assert his rights in other ways, and it matters not whether the principal's want of knowledge was due to designed or undesigned concealment, or whether the question arises between the principal and the agent or as to third persons." And this statement of the rule has met with the approval of this Court in Brittain v. Westall, 137 N.C. 30. We, therefore, find it to be of the very essence of ratification, as of an election, that it be done advisedly, with a full knowledge of the party's rights. Baldwin v. Burrows, 47 N. J., 199, 211. In Thorndike v.(620) Godfrey, 3 Me. at p. 432, the Court, in applying the rule, said: "We can never consider consent and ratification as implied, in those cases where there is no knowledge of the facts, to which it is said consent and *Page 537 
ratification extend. This would be an effect without a cause." The authorities are uniformly to the same effect.
Applying the principle to this case, we find no evidence of ratification of Clark's unauthorized act by the defendants. It is true, the defendants shipped 79 barrels of gasoline, but this is perfectly consistent with their ignorance of the facts at the time of the shipment.
It has been said that the act which is claimed to be a ratification must be with knowledge of the facts and "inconsistent with the existence of an intention not to adopt, and hence conduct which would have been within the principal's right in case he repudiated the transaction will not amount to ratification. And if the principal is ignorant of material facts, as where he accepts moneys from an agent without knowledge that they are the proceeds of an unauthorized sale, intention to ratify cannot be implied." Tiffany on Agency, p. 66.
The cases are numerous where the courts have held that the sale or acceptance of goods, or the doing of other acts, under an unauthorized contract made by an agent, when the principal proceeds without knowledge of the facts, is not a valid ratification; otherwise where the principal acts with knowledge or with what is equivalent to it. "If an agent, having unwritten authority to make leases of real property, execute a lease for more than three years, the knowledge of his principal that the tenant is in possession and paying rent is not sufficient to work either ratification or estoppel." Clement v. Young, 70 N.J. Eq., 677. The same was held in a case where the wife paid interest on a note of her husband and her mortgage to secure it, under the belief on her part that the mortgage was binding upon her, the Court saying that there was no ratification. Brown v. Rouse, 104 Cal. 672. So in Nichols v.Bruns, 5 S.D. 28, it was decided that one cannot be held liable for the fraudulent representations of an unauthorized agent by accepting the benefits without knowledge of the fraud, and where the court charged the jury if the principal accepted the benefits he was (621) liable for the representation, held error, as the mere acceptance of benefits did not imply knowledge of the facts. Where bailiffs distrained for rent in a manner not authorized by the landlord, he was said not to be liable, though he received the proceeds of property taken and sold to pay the rent, unless he had knowledge of the unauthorized acts of his agents. Lewis v. Read, 13 M. and W., 834. See, also, Freeman v.Rosher, L. R., 13 Q. B., 780; Combs v. Scott, 94 Mass. (12 Allen), 493;Wheeler v. N. S. Co., 39 Fed., 347, in which many cases of the same kind are collected.
The principle was strongly and clearly stated by the Court in Bell v.Cunningham, 3 Peters (U.S.), 69: "If the principal, after a knowledge *Page 538 
that his orders have been violated by his agent, receives merchandise purchased for his contrary to orders, and sells the same without signifying any intention of disavowing the acts of the agent, an inference in favor of the ratification of the acts of the agent may be fairly drawn by the jury. But if the merchandise was received by the principal under a just confidence that his orders to his agent had been faithfully executed, such an inference would be in a high degree unreasonable." And the doctrine is well stated in Roberts v. Rumley, 58 Iowa 306, 307: "It does not appear that the defendants ever had any intimation of the agreement which the plaintiff now alleges to exist, and which he is seeking to enforce, until the commencement of this suit. They could not have ratified and adopted an act about which they knew nothing. . . . To hold that the principal is bound by agreements between the special agent and the person with whom he contracts, not authorized by the agent's appointment, and of which he had no knowledge when he accepted the benefits of the contract, would be entirely subversive of the whole doctrine of special agency, and instead of requiring the persons dealing with the agent to ascertain, at his peril, that the agent has kept within his special authority, would require the principal to inquire, at his peril, whether the agent had gone beyond it." Here plaintiffs had full notice of the lack of authority.
(622) Ratification of an unauthorized act of the agent to be binding must not only be made with full knowledge of all material facts, but the burden is upon the party relying upon it to prove adoption of the agent's act with such knowledge. Tiffany on Agency, p. 73: Moorev. Ensley, 112 Ala. 333; Combs v. Scott, supra; Wheeler v. N. S. Co.,supra.
In this case there is no evidence that defendants had knowledge of the fact that his agent and the plaintiffs had wrongfully antedated the contract, which, of course, was calculated to mislead and deceive the plaintiffs, unless we should hold, contrary to principle and authority, that the mere shipment of the gasoline was sufficient to show such knowledge. On the contrary, the only evidence upon the question tends strongly to show that the defendants had no knowledge of the facts until the first trial of this case, when one of the witnesses testified that the contract had been incorrectly dated. If there was such prior knowledge on the part of the defendants, the plaintiffs, upon whom rested the burden of proving it, had the means of doing so by the agent himself, who was not called to the stand. They should have known the facts, as a man would hardly ratify an unauthorized act, which was not binding upon him, and thereby entail a heavy loss upon himself, when he could so easily escape the liability by repudiating the wrongful act. *Page 539 
The case does not present a favorable aspect for the plaintiffs in any view we may reasonably take of it. It has not the right complexion. There is no satisfactory explanation of the order for 350 barrels of the oil, sent in just before the expiration of the year fixed by the alleged contract, when they had only ordered during the nine preceding months 79 barrels as fully sufficient to supply their wants for that period, and supposed (why, is not clear) that they had already ordered 150 barrels. The whole case shows that defendants were ignorant of the facts from the beginning to the end of this transaction.
It is perfectly evident that when the agent promised to "get the contract through" he expected to do so, and did do so, by a deception practiced upon his principals, and plaintiffs must have been cognizant of this purpose. There was no use at all in misdating the contract if such was not the object, because if a fair submission of the (623) matter to the defendants for the purpose of having an exception made, in this instance, to the agent's instructions was the intention of the parties, there would have been a full disclosure of the facts and no suppression of the true date, or, to speak more accurately, no misrepresentation of it. The transaction would have been a normal one and would not have taken so unusual and deceptive a form. The principal was entitled to know what his agent had done, if beyond the limit of his authority, and especially if directly in violation of his instructions, and there should have been no concealment of the facts under the guise of a false date.
The plaintiffs, having the burden of proof upon them, have not met the requirement of the law in such cases. The agent "put the contract through," but in disobedience of positive instructions, and, as the case shows, by imposition upon his principal, who was ignorant of the real transaction. It is hardly reasonable or conceivable to suppose that defendants would have assented to a losing contract, or that plaintiffs could have believed that they would do so. That would be presuming too much upon their charity and benevolence; and besides, if a fair and honest request for such a contract was intended, why falsify the date, instead of proceeding according to the natural and ordinary course of business dealings where the parties are inspired by perfect good faith? The whole trend of the evidence produces the conviction that the defendants were the victims of the deception, and there is nothing to relieve the transaction of the taint which, in law, vitiates it. As Chief Justice Wilmot said in Collins v. Blanton, 1 Wilson, 341 (1 Smith's Leading Cases (9 Ed.), 646): "The manner of the transaction was to gild over and conceal the truth, and wherever courts of law see such attempts made to conceal such wicked deeds, they will brush away the *Page 540 
cobweb varnish, and show the transactions in their true light. . . . All writers upon our laws agree in this: no polluted hand shall touch the pure fountains of justice.... You shall not have a right of action when you come into a court of justice in this unclean manner." Ex dolo malo non oritur actio.
(624) E. F. Wise testified: "Mr. Clark told me had instructions from the company not to take the contract (not to sell after 19 August), and it was dated back so that the company would furnish the oil. . . . The only way he could make the contract was to date it back, and I agreed to take it with that understanding." And again: "Q. The only way he could get that to you was to date the contract back? A. That was the only way to get it through, so he said." This is a fair specimen of the evidence, which shows that plaintiffs participated in the wrong of the agent. The law will not countenance any such transaction.
The nonsuit should have been allowed.
Reversed.
Cited: Cox v. Lumber Co., 175 N.C. 310; Hancammon v. Carr, 229 N.C. 54.