CAROLINA EQUIPMENT AND PARTS COMPANY, A CORPORATION V. WOODROW ANDERS.

(Filed 13 October, 1965.)

**1. Principal and Agent § 6—**

Even though the testimony of an agent in regard to modification of the contract is incompetent to establish the agent's authority to modify it, his testimony may be competent to establish the terms of the modification when there is other evidence tending to show the principal authorized the modification or ratified it.

**2. Contracts § 19—**

A novation is a substitution of a new contract for an old one which is thereby extinguished.

**3. Same—**

In the case of a novation of an executory contract, the substitution of the newer obligations of the parties, respectively, constitutes consideration for the release of the original obligations; if the contract has been executed by one of the parties, a valid novation requires a consideration *dehors* the original agreement.

**4. Same—**

The return of one of the items purchased under a contract of sale is sufficient consideration on the part of the purchaser to support a novation of the contract.

**5. Principal and Agent § 6—**

In order to constitute a ratification of an unauthorized act of an agent, the principal must have knowledge of all of the facts relative to the unauthorized transaction and must signify his intent to ratify by word or by conduct which is inconsistent with an intent not to ratify. However, the principal will be bound by a course of conduct reasonably tending to show an intention to ratify even though he may not so actually intend, since the law will presume that a person intends the legal consequences of what he does.

**6. Same—**

While a principal must have actual knowledge of all the facts relative to an unauthorized act of his agent in order to ratify the unauthorized act,

and is not chargeable with what would be discovered by reasonable inquiry, nevertheless knowledge of the principal may be inferred, and when the evidence discloses that a person of ordinary intelligence would infer the facts, the jury may find from it that the principal had knowledge.

**7. Same—**

A principal may not ratify the act of his agent in part and repudiate such act in part.

**8. Same; Contracts § 19— Evidence held to raise jury question whether principal ratified agent's act in negotiating a novation of the contract.**

This action was instituted to recover the balance of the purchase price of three pieces of heavy equipment. Defendant contended that the parties entered into a novation under which defendant returned one piece of equipment with agreement that he should be liable for the balance of the purchase price on the other two pieces only. Defendant's evidence tended to show that the novation was agreed to by plaintiff's agent, that he gave the agent a check marked on its face for three payments to be applied on the purchase price of the equipment retained, that the check was in an amount equal to three payments on the equipment retained with a discrepancy of some cents between its amount and the sum necessary to constitute one payment under the original contract, and that the next day the seller's agent took one of the pieces of equipment in accordance with the new agreement but returned this piece to the buyer without explanation the next day. The evidence further tended to show that the seller x-ed out the "3" on the check and cashed same. *Held:* Even though the agent lacked authority to agree to the novation, the evidence is sufficient to be submitted to the jury as to the ratification of the novation by the seller.

**9. Pleadings § 4—**

The fact that a party prays for damages to which he is not entitled does not preclude recovery by him on a theory supported by allegation and proof.

**10. Appeal and Error § 41—**

Asserted error in limiting the admission of certain evidence to the purpose of corroboration will not justify a new trial when appellant fails to show a reasonable probability that the asserted error affected the result of the trial.

**11. Trial § 41—**

Where the issues submitted are sufficient to embrace all questions in dispute between the parties, assignment of error to the failure of the court to submit issues tendered will not be sustained.

APPEAL by plaintiff from *Martin, S. J.,* March 1965 Civil "A" Session of BUNCOMBE.

Action by plaintiff to recover from defendant $17,354.00, plus interest, the balance allegedly due on the purchase price of three pieces of heavy equipment.

The allegations of the complaint, admitted by the answer, establish these facts: In June 1963, for the price of $26,650.00, defendant purchased from plaintiff an Eimco crawler bulldozer (Eimco) and a Birmingham trailer and an International tractor (tractor-trailer). As defendant's down payment of $8,800.00, plaintiff accepted from defendant a backhoe digger. For the balance of $17,850.00 defendant executed his promissory note to be paid in 35 monthly installments of $496.00 each, with a final payment of $490.00. The first payment was due July 21, 1963, and the note was secured by the usual conditional sales agreement. Defendant made no payment of $496.00.

Plaintiff instituted this action on January 7, 1964 and, at the same time, resorted to claim and delivery proceedings to repossess the equipment which it valued at $12,500.00. In due course the sheriff delivered the property to plaintiff. By consent, it was sold at auction on July 10, 1964. Eagle Construction Company purchased the property for $8,500.00.

Answering the complaint, defendant alleges: The backhoe digger which defendant gave in trade was worth $8,500.00. The Eimco which plaintiff had warranted to be "reasonably fit and suitable for the purposes for which it was manufactured and sold" was "completely unfit and unsuitable," and plaintiff was unable to put it in proper working condition. On September 19, 1963 plaintiff, by its authorized agents, agreed that it "would take back" the Eimco, permit defendant to keep the tractor-trailer at an agreed price of $5,288.40, plus $663.84 accumulated interest, a total of $5,952.24. Defendant then gave his check for $496.02 representing three monthly payments of $165.34 each *on the tractor-trailer*, leaving a balance due of $5,456.22. In accordance with this agreement, plaintiff removed the Eimco from defendant's lot but returned it the next day. In breach of the agreement, plaintiff refused to credit the $496.02 payment toward the purchase price of the tractor-trailer and demanded payment of $17,354.00, the original indebtedness less $496.00. Defendant further averred that even if plaintiff's agent lacked authority to enter into the alleged novation, by accepting and cashing the check for $496.02, representing three payments on the tractor-trailer, plaintiff ratified the agreement between its agent and defendant. Defendant prayed that he recover $10,000.00 for the breach of the warranty on the Eimco and $8,500.00 for the wrongful repossession of the tractor-trailer "arising out of the loss by him of the Backhoe Digger traded to the plaintiff by the defendant at the time of the original purchase."

By reply, plaintiff denied the allegations of defendant's further answer, defense, and counterclaim, and alleged that if plaintiff and defendant had entered into a new contract as defendant alleged, it pre-

cluded any recovery by defendant for a breach of warranty as to the Eimco; that defendant had breached the new contract and was liable to plaintiff for the sum of $4,456.22, the alleged contract price of the tractor-trailer as reduced by the payment of $496.02.

Defendant's evidence tends to show: Defendant tried out the Eimco for a month before he bought it. It was completely unsatisfactory from the beginning, but he relied upon plaintiff's promise to repair it. The Eimco continued to break down on every job although plaintiff made six attempts at repairs. As a result, defendant was unable to make any payments on the equipment. On September 19, 1963, in response to defendant's final complaint to plaintiff's Raleigh office, Mr. H. P. Manuel, the salesman who had negotiated the original contract with defendant, came to see defendant at Old Fort where he was working. Defendant told Manuel that he could not use the Eimco, but he wanted to retain the tractor-trailer if, in the contract of purchase, this equipment could be separated from the Eimco. Manuel then went into a telephone booth "to call his office" in Raleigh. Twenty minutes later he emerged to report that "he had talked to the boss"; that if defendant would catch up the back payments on the truck and trailer it was "fixed up" so that defendant could keep the truck and trailer and plaintiff would take the "Eimco dozer" back. Defendant and Manuel then went to the Friendly Tavern, a place operated by defendant's wife in Black Mountain. There, in defendant's checkbook, on the back of a stub sheet (defendant's Exhibit 3), Manuel figured the purchase price of the tractor-trailer at $5,288.40, and accumulated interest at $663.84, a total of $5,952.24. Above these figures he multiplied $165.34 (the amount of each monthly installment) by 3 to get the sum of $496.02, the amount due on the tractor-trailer. He then wrote check No. 332 (defendant's Exhibit 1) to plaintiff for $496.02, noting thereon that it was "for (3) payments on truck & trailer." Thereafter, someone other than defendant blotted out the figure "(3)" on the check. At the time he wrote the check Manuel also filled out its stub in defendant's book (defendant's Exhibit 2) showing the check to be "for (3) payments on truck & trailer." Defendant then signed the check. Before delivering it to Manuel, defendant took the check over to a booth where two ladies, customers and friends of his wife, were sitting and asked them "to be a witness that the check was on a truck and trailer." From the beginning, defendant had not wanted the tractor-trailer in the same contract with the bulldozer.

Manuel told defendant he thought he had the bulldozer sold at Kings Mountain, and, the next day, September 20th, one of plaintiff's employees "hauled it off." The following day, without explanation, it was returned to defendant's parking lot where it remained until the

sheriff took it under claim and delivery. Plaintiff cashed defendant's check for $496.02, but applied it to the original contract. Defendant made no further payments.

The backhoe which defendant gave plaintiff in trade for the equipment in question was worth $8,500.00. The value of the tractor-trailer at the time plaintiff repossessed it was $5,900.00.

Plaintiff's evidence tends to show: Plaintiff sold the secondhand Eimco to defendant without warranty. It was then in excellent condition but thereafter broke down and gave a lot of trouble. Defendant made complaints to the Raleigh office. Plaintiff replaced some parts and repaired it on at least six different occasions. The conditional sales contract in suit was signed in June 1963 by defendant and Mr. H. P. Stephenson, the president of the plaintiff corporation. Thereafter, Manuel, plaintiff's sales representative for Western North Carolina, called on defendant frequently trying to collect past-due payments. Defendant's excuse for nonpayment was lack of work and inability to keep operators. On September 19, 1963, defendant informed Manuel that his operators preferred a Caterpillar bulldozer to an Eimco and inquired about the possibility of trading the Eimco for a Caterpillar. Manuel telephoned Mr. Edward Dougher, plaintiff's vice-president and general manager, in Raleigh. After that call Manuel reported to defendant that plaintiff would consider a trade if defendant would give him some money. Although Manuel, at defendant's request, went "over a breakdown of the contract," there was no talk whatever about taking the bulldozer back and no discussion of any separation of equipment in the contract. At that time Manuel did not mention such a possibility to Dougher nor did he tell him that defendant was not satisfied with the Eimco. According to Manuel, after he went over the figures with defendant, he figured the cost of financing the tractor-trailer over a period of 36 months on the back of a stub page in defendant's checkbook. At defendant's request, he wrote a check for him "on the truck and trailer," and "accepted the check for approval by (my) company but not just on the truck and trailer." On cross-examination, Manuel admitted that he wrote the check "for (3) payments on truck & trailer" and later "scratched over" the figure *3*.

Manuel, according to plaintiff's evidence, had no authority to modify defendant's old contract or to make a new one. His authority was to find a prospect, get an offer, and submit it through the Raleigh office to Stephenson if the sale involved a trade-in or financing. The only purpose of Manuel's visit to defendant on September 19, 1963, was to collect some money. The following day, with the permission of Mr. Dougher, Manuel took the Eimco to Kings Mountain to demonstrate it to a prospect for the sole purpose of helping defendant dispose of it

so that he might get the Caterpillar he preferred. The prospect, however, would not buy it, and, in accordance with Mr. Dougher's instructions, Manuel returned the bulldozer to defendant immediately. This effort to help defendant cost plaintiff about $100.00.

The next day, or the day after, according to Manuel, he delivered defendant's check to Stephenson "for the approval of the finance company" and told him defendant wanted a separation of the contract. He also told him that this was the only money he could get from defendant who had requested him "to write the check on that basis to be presented to the finance company." The following is Mr. Stephenson's version of what Manuel told him when he delivered defendant's check:

> "Mr. Anders requested that he would like to have a separation of the truck and trailer and the Eimco tractor. He said that he told Mr. Anders he would present that request to me; that it would be up to me as to whether or not we could do this and he further told Mr. Anders that his instructions were from me to deliver a message to Mr. Anders at that time, either he paid us money or we turned it over to the attorneys immediately to repossess the three pieces of equipment involved. And he explained to Mr. Anders that in any event he must come away from his place with money or we were through messing with him, that our attorneys would proceed to repossess the equipment which was badly in default." (The judge limited this evidence to the corroboration of Manuel, and it is the subject of assignment of error No. 12).

Stephenson's reaction to this proposition, according to his testimony:

> "As to what statement Mr. Manuel made regarding any alleged new contract, Mr. Manuel delivered to me Mr. Anders' request that they be separated. I emphatically told Mr. Manuel that this was ridiculous; we wouldn't consider it. I further asked Mr. Manuel if he emphatically told Mr. Anders that we must use the check that we had collected against the obligations. I then had the check endorsed and forwarded." (This evidence went in unrestricted).

On November 4, 1963, Manuel met defendant in Columbia, South Carolina, and showed him "a real good 933 Cat motor." There, they discussed with Mr. Stephenson a separation of the contract with a trade-in of the Eimco on the Caterpillar. *According to Manuel:* Stephenson told defendant such a separation would require the approval of the finance company which held his note. *According to Stephenson:* He flatly refused to consider a separation, declined to

take the Eimco back, and told defendant it was his property and must be traded as such. Defendant then promised to catch up the payments on the original contract and about the middle of November he again promised to do so. *According to defendant:* Neither the Eimco tractor nor the old contract was mentioned on his trip to Columbia. He went to Columbia just to see the "933 Cat."

When the case went to the jury, plaintiff contended it was entitled to recover $5,227.00. This figure represented the amount sued for ($17,-354.00), plus the expense of the claim and delivery ($373.00), less the value ($12,500.00), which plaintiff had placed upon the equipment in the affidavit for claim and delivery. During the trial, defendant abandoned any claim for breach of warranty and, instead of the $18,500.00 for which he prayed in his answer, defendant asked to recover only $612.00, the difference between his valuation of the tractor-trailer on September 19, 1963 ($5,900.00), and the alleged new contract price ($5,288.00). The jury, in answer to issues submitted, found that (1) plaintiff and defendant entered into a new contract on September 19, 1963, as alleged in the answer; (2) plaintiff breached the new contract; (3) defendant was entitled to recover $300.00 from plaintiff; and (4) plaintiff was entitled to recover nothing from defendant.

Plaintiff appeals from the judgment entered upon this verdict.

*Van Winkle, Walton, Buck and Wall by Roy W. Davis, Jr., for plaintiff appellant.*

*Harold K. Bennett and E. Glenn Kelly for defendant appellee.*

SHARP, J.  Plaintiff assigns as error the failure of the trial court to allow its motion to dismiss defendant's counterclaim. Defendant, having admitted the execution and delivery of the conditional sales contract in suit, must establish the novation he has alleged if plaintiff is not to recover the amount it claims.

To establish the terms of the novation he alleges, defendant relies upon his conversations with Manuel, plaintiff's sales agent for Western North Carolina. The evidence discloses, however, that Manuel himself had no authority to modify the contractual relations existing between plaintiff and defendant, and that defendant knew this. 2 C.J.S., Agency § 114, p. 1324. Manuel's declarations to defendant on September 19, 1963, which tended to show his authority to take back the Eimco and to modify the contract by a "separation" were not, as the trial judge held, competent to establish the nature and extent of Manuel's agency. *Commercial Solvents v. Johnson,* 235 N.C. 237, 69 S.E. 2d 716. They were, however, competent to establish the terms of the alleged new con-

tract which, defendant contends, Manuel purported to make on behalf of plaintiff, and which plaintiff thereafter ratified.

A novation is the substitution of a new contract for an old one which is thereby extinguished. *Tomberlin v. Long,* 250 N.C. 640, 109 S.E. 2d 365. One of the several methods by which a contract may be discharged is the substitution of a new contract, the terms of which differ from the original. *Bixler v. Britton,* 192 N.C. 199, 134 S.E. 488; *Public Utilities Co. v. Bessemer City,* 173 N.C. 482, 92 S.E. 331; *Redding v. Vogt,* 140 N.C. 562, 53 S.E. 337. "In such cases the release of the obligations of the old and the substitution of new obligations constitute valuable considerations." *Lipschutz v. Weatherly,* 140 N.C. 365, 369, 53 S.E. 132, 133; 66 C.J.S., Novation § 12. While a contract is wholly executory the mutual consent of the parties to discharge each other from its obligations is sufficient consideration for a rescission. When, however, as here, the contract has been executed by one of the parties, a valid novation requires a consideration. *Palmer v. Lowder,* 167 N.C. 331, 83 S.E. 464; *McKinney v. Matthews,* 166 N.C. 576, 82 S.E. 1036. The return of the Eimco to plaintiff would be sufficient consideration for the alleged novation, which released defendant from his obligation to pay for the Eimco and set up a new schedule of payments for the tractor-trailer only.

The determinative question here is whether plaintiff's acceptance of the check for $496.02 for "payment on truck & trailer," coupled with the other circumstances disclosed, was "evidence of ratification fit to be considered by a jury." *Mfg. Co. v. McPhail,* 181 N.C. 205, 209, 106 S.E. 672, 674.

> " 'If certain acts have been performed or contracts made on behalf of another without his authority, he has, when he obtains knowledge thereof, an election either to accept or repudiate such acts or contracts. If he accept them, his acceptance is a ratification of the previously unauthorized acts or contracts, and makes them as binding upon him from the time they were performed as if they had been authorized in the first place.' *Gallup v. Liberty County,* 57 Tex. Civ. App., 175, 122 S.W. 291." *McNeely v. Walters,* 211 N.C. 112, 113, 189 S.E. 114, 115.

In order to establish the act of a principal as a ratification of the unauthorized transactions of an agent, the party claiming ratification must prove (1) that at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction, *Wilkins v. Welch,* 179 N.C. 266, 102 S.E. 316; *Wise v. Texas Co.,* 166 N.C. 610, 82 S.E. 974, and (2) that the principal had signified his assent or his intent to ratify by word or by conduct which

was inconsistent with an intent not to ratify. The jury may find ratification from any course of conduct on the part of the principal which reasonably tends to show an intention on his part to ratify the agent's unauthorized acts. 3 Am. Jur. 2d, Agency § 162. "It is what a party does, and not what he may actually intend, that fixes or ascertains his rights under the law. He cannot do one thing and intend another and very different and inconsistent thing. The law will presume that he intended the legal consequences of what he does, or, in other words, that his intention accords in all respects with the nature of his act." *Norwood v. Lassiter*, 132 N.C. 52, 56-57, 43 S.E. 509, 510.

A principal who acted without actual knowledge of the material facts will not be held to have ratified an unauthorized act of his agent even though he failed to exercise due diligence which would have revealed the truth. "This general rule pertains whether the want of knowledge arises from the intentional or the unintentional concealment or misrepresentation of the agent, or from his mere innocent inadvertence; and, of course, if the material facts are suppressed or unknown, the ratification is invalid, because founded on mistake or fraud." 3 Am. Jur. 2d, Agency § 173. However, as stated by the American Law Institute, "knowledge by the purported principal can be inferred as in other cases; when he has such information that a person of ordinary intelligence would infer the existence of the facts in question, the triers of fact ordinarily would find that he had knowledge of such fact." Restatement (Second), Agency § 91; 1 Mechem, Law of Agency § 406 (2d Ed. 1914). See *Fisher v. Lumber Co.*, 183 N.C. 485, 111 S.E. 857 and *Hall v. Giessell*, 179 N.C. 657, 103 S.E. 392, cases in which the court, in sustaining judgments based on the jurys' findings of ratification, commented that the facts were sufficient to show that the principals knew or should have known the terms of their agents' contracts and that the jurys had the right to consider this and other evidence as bearing upon the question of ratification. See also Breckenridge, *Ratification in North Carolina*, 18 N.C. L. Rev. 308, 327-334 (1940).

A principal is not permitted to repudiate the act of its agent as being beyond the scope of his authority while accepting the benefits of what he has done. *Jones v. Bank*, 214 N.C. 794, 1 S.E. 2d 135. "It is also a settled principle of ratification that the principal must ratify the whole of his agent's unauthorized act or not at all. He cannot accept its benefits and repudiate its burdens." *Parks v. Trust Co.*, 195 N.C. 453, 456, 142 S.E. 473, 474. *Accord, Maxwell v. Distributing Co.*, 204 N.C. 309, 168 S.E. 403.

Clearly, if plaintiff's president, Stephenson, knew that defendant had attached conditions to the acceptance of his check he could not endorse

it, collect the proceeds for plaintiff, and then repudiate the conditions attached to it notwithstanding he may have intended to do so. *De-Loache v. DeLoache,* 189 N.C. 394, 127 S.E. 419; *Mfg. Co. v. McPhail, supra; Wilkins v. Welch, supra; Moore v. Accident Assurance Corp.,* 173 N.C. 532, 92 S.E. 362; *Bank v. Justice,* 157 N.C. 373, 72 S.E. 1016; *Norwood v. Lassiter, supra.* Such knowledge and conduct would have made Stephenson's position equivalent to that of the man who cashes a check which purports to be in full payment of a disputed account. Speaking to this situation in *Petit v. Woodlief,* 115 N.C. 120, 20 S.E. 208, the Court said, "When the plaintiff endorsed this draft and collected the money, with the proposal staring him in the face that it should, if received, operate to discharge the whole debt, instead of returning it to the drawer and declining the offer, we think that his conduct amounted to an acceptance of it. . . ." 115 N.C. at 125, 20 S.E. at 209. *Accord, Supply Co. v. Watt,* 181 N.C. 432, 107 S.E. 451; *Aydlett v. Brown,* 153 N.C. 334, 69 S.E. 243; *Armstrong v. Lonon,* 149 N.C. 434, 63 S.E. 101; *Kerr v. Sanders,* 122 N.C. 635, 29 S.E. 943.

In *Lipschutz v. Weatherly, supra,* plaintiff agreed with defendants that they should have an exclusive contract for the sale of plaintiff's cigars (which they were authorized to purchase at a special price) in a specific area so long as they complied with certain conditions. Plaintiff, contending that defendants had violated the conditions, notified them that in the future defendants could order only upon the same terms and conditions as any other person. Thereafter plaintiff declined to fill defendants' orders until they agreed to the cancellation of the previous contract. This defendants did and ordered cigars upon the new terms. When defendants refused to pay for these cigars, plaintiff sued for the purchase price and defendants set up a counterclaim for damages for breach of contract. In affirming the trial judge's peremptory instruction in favor of plaintiff, the Court said that, assuming plaintiff had breached the original contract, defendants could have sued for damages; instead, they assented to plaintiff's terms for further sales and made a new contract which discharged the old, thereby eliminating any claim for damages resulting from its breach. See also *Mfg. Co. v. McPhail, supra.*

The evidence here strongly suggests that if Manuel's prospect in Kings Mountain had purchased the Eimco, this lawsuit would have been averted; that Manuel, thinking he had the Eimco sold elsewhere, talked one way to defendant Anders, and thereafter, when the sale was not made, another way to his employer Stephenson. It was then, no doubt, that he blotted out the figure *3* within the parentheses on the check. But, be that as it may, Stephenson knew that defendant had requested "a separation of the truck and trailer and the Eimco trac-

tor," and that at the time defendant made the request he had issued a check for $496.02 which stated that it was "for (3) payments on truck & trailer." Each monthly payment under the original contract was to have been an even $496.00. The notation of plural payments totalling $496.02 negated a payment on the original indebtedness. Obviously defendant was not making a payment on the original contract. Stephenson said that, after telling Manuel defendant's proposition was ridiculous and not to be considered, he asked him "if he had emphatically told Mr. Anders that we must use the check that we had collected against the obligations." Curiously enough, Stephenson did not testify what reply, if any, he got to this inquiry. He merely said that after asking this question he "then had the check endorsed and forwarded."

We think there was "evidence of ratification fit to be considered by the jury." The court instructed the jury, in effect, that in order for it to find that plaintiff and defendant entered into a new contract on September 19, 1963, defendant must satisfy the jury (1) that defendant and Manuel made the agreement defendant alleged; (2) that defendant's payment of three installments on the tractor-trailer under the new contract was received by the plaintiff with knowledge of the new contract and with "intent on the part of the plaintiff corporation to ratify and confirm the transaction and substitute this contract for the contract of June 1963," and that if defendant failed to satisfy the jury of these facts it would answer the first issue (novation) against defendant. Plaintiff has no cause to complain of this instruction. The verdict that there had been a novation was supported by competent evidence, the credibility of which was for the jury. Plaintiff's motion to nonsuit defendant's counterclaim was properly overruled. The fact that defendant prayed damages to which he is not entitled does not preclude recovery on a theory supported by the allegations and proof. *Board of Education v. Board of Education,* 259 N.C. 280, 130 S.E. 2d 408; Strong, N. C. Index, Pleadings § 4.

Plaintiff's assignment of error No. 12 relates to the limitation which the court placed upon that testimony of Mr. Stephenson as noted in the statement of facts. Conceding the error in limiting this evidence to the corroboration of Manuel, we regard the probable effect of this limitation upon the jury as entirely too tenuous to justify a new trial. Technical error alone will not upset a judgment. Appellant must show a reasonable probability that the error affected the result of the trial. *Johnson v. Heath,* 240 N.C. 255, 81 S.E. 2d 657. As heretofore pointed out, the crucial question of fact is what knowledge did Stephenson have when he accepted the defendant's check for $496.02. Unrestricted evidence establishes that he knew of defendant's request "for a separa-

tion in the contract" of the Eimco from the tractor-trailer and that with this knowledge he accepted a check "for ⟨✗⟩ payments on truck & trailer."

The issues submitted were sufficient to embrace the questions in dispute between the parties, and plaintiff's assignment of error based on the failure of the judge to submit the issues it tendered is not sustained. *Hall v. Giessell, supra.* Each of plaintiff's other assignments of error has been considered; no prejudicial error appears.

No error.