THE HOME INSURANCE COMPANY v. INGOLD TIRE COMPANY, INC.

No. 99

(Filed 30 December 1974)

1. **Insurance § 135— fire insurance — security interest in chattels — subrogation**

   When a mortgagee purchases insurance with his own funds solely for his own protection, the insurer, upon payment of the mortgagee's loss as provided in the policy, is subrogated to the rights of the mortagee against the mortgagor; accordingly, where defendant failed

to maintain insurance on chattels held by it in which B-W Acceptance Corporation had a security interest and B-WAC did maintain a blanket policy covering those chattels, plaintiff was subrogated to the rights of B-WAC against defendant to the extent plaintiff compensated B-WAC under the blanket policy for security interests held by B-WAC in property lost in a fire.

2. **Appeal and Error § 42— subrogation receipt — omission from record — no reversible error**

In an action to recover sums allegedly due plaintiff upon its subrogation claim against defendant, failure to include the subrogation receipt from insured to plaintiff in the record was a technical oversight which does not constitute reversible error, since its correction would not produce a different result.

3. **Evidence § 29; Insurance § 135— fire insurance — trust receipts — sufficiency of evidence of loss**

Trust receipts prepared by insured which showed the items sold to defendant, the amounts owed insured on each item, and the date insured received full payment from defendant, thereby indicating that the released item was no longer subject to the security agreement, were sufficient evidence to permit the trial judge legitimately to infer the nature and value of the merchandise on hand and the value of insured's security interest therein at the time of the fire.

PLAINTIFF appeals from decision of the Court of Appeals, 22 N.C. App. 237, 206 S.E. 2d 320 (1974), vacating judgment of *Clark, J.*, 4 September 1973 Session, DURHAM Superior Court and awarding defendant a new trial.

This is a civil action to recover sums allegedly due The Home Insurance Company upon its subrogation claim against defendant. Pertinent allegations of the complaint are summarized in the numbered paragraphs which follow.

1. On or about 4 August 1968 defendant entered into an agreement with Borg-Warner Acceptance Corporation (B-WAC) entitled "Finance Agreement and Power of Attorney to Expedite Wholesale Financing," commonly known as a dealer floor-planning agreement. The primary purpose of the agreement was to facilitate the financing of purchases of merchandise for inventory by defendant.

2. Under the terms of the agreement B-WAC was to take a security interest in all merchandise for inventory which it financed for the defendant. Under Paragraph Seven of the agreement defendant agreed to hold the chattels at its risk and to carry insurance thereon with a loss payable clause in favor of B-WAC; and, if defendant failed to provide insurance,

B-WAC was authorized to obtain insurance on the merchandise and charge defendant for the cost of same.

3. On various dates between 22 October 1968 and 6 March 1969 sundry items of merchandise, including color television sets, stereos, radios, air conditioners, ranges, etc., were shipped to and received by the defendant pursuant to the financing agreement. The distributor who shipped the goods was Southern Appliances, Inc. of Charlotte, North Carolina.

4. Prior to each shipment the distributor issued an invoice setting forth each item and its price. The invoices were delivered to B-WAC with copies to defendant. B-WAC then paid the distributor for the goods and, pursuant to the agreement and its power of attorney contained therein, executed a promissory note for the cost of the merchandise with the defendant as maker and B-WAC as payee. At the same time a trust receipt was prepared listing by model and serial number the articles of merchandise shipped to defendant. A copy of both documents was forwarded to defendant pursuant to the agreement.

5. On or about 11 March 1969 defendant's building and contents, including numerous items of merchandise covered by the financing agreement, were destroyed by fire. Defendant had failed to comply with its agreement with B-WAC to insure the merchandise against fire loss and had no insurance on this merchandise at the time of the fire.

6. Long before 11 March 1969 B-WAC had purchased a blanket insurance policy from plaintiff which covered all merchandise located within the continental United States and Canada in which B-WAC had an interest under a conditional sales agreement, chattel mortgage or other similar form of encumbrance. This blanket policy was purchased by B-WAC at its own expense and contained no provisions or conditions of any kind imposing an obligation or duty on B-WAC to insure the property for the benefit of defendant or any other dealer with a floor-planning agreement with B-WAC. One of the conditions of the blanket policy was that the insurance under it be considered as *excess insurance* and not apply or contribute to the payment of any loss until any and all other insurance was exhausted.

7. In accordance with the terms of the blanket policy the plaintiff Home Insurance Company paid B-WAC $12,745.01 covering the reasonable value of merchandise destroyed in the

fire on 11 March 1969 at Ingold Tire Company's place of business. Plaintiff alleges that pursuant to the subrogation clause in the blanket policy it is subrogated to all rights and claims that B-WAC had against defendant and prays judgment for the amount it paid B-WAC plus interest, attorney's fees and costs.

Defendant filed answer denying the material allegations of the complaint and specifically denying that it owed plaintiff anything by way of subrogation or otherwise.

Jury trial was waived and, following a trial before Judge Clark, the trial court made findings of fact and conclusions of law and adjudged that plaintiff recover of defendant the sum of $12,744.11 plus interest and costs. Defendant appealed and the Court of Appeals, with Campbell, J., dissenting, vacated the judgment and remanded the cause for a new trial on the basis of alleged evidentiary errors. Plaintiff thereupon appealed to the Supreme Court as of right under G.S. 7A-30(2), and we allowed defendant's petition for certiorari to bring up for review at the same time the disputed subrogation question. Errors assigned by both parties will be discussed in the opinion.

*Louis A. Bledsoe, Jr., and Yates W. Faison, III of the firm Berry, Bledsoe & Hogewood, P.A., Attorneys for plaintiff appellant.*

*Edwards and Manson by Daniel K. Edwards, Attorneys for defendant appellee.*

HUSKINS, Justice.

In the financing agreement with B-WAC defendant agreed to obtain insurance covering floor-planning merchandise and, if defendant failed to do so, authorized B-WAC to purchase such insurance at defendant's expense. The trust receipts contained a similar promise by defendant to purchase insurance with a loss payable clause. Defendant breached its promise to purchase insurance and now contends that, since the financing agreement allowed B-WAC to obtain the insurance at defendant's expense, defendant is entitled to the benefit of the insurance proceeds paid under B-WAC's *blanket* policy, thus depriving plaintiff of any right of subrogation. The trial court and the Court of Appeals rejected this contention and held that plaintiff, having paid B-WAC's loss, was subrogated to B-WAC's rights against

defendant. We allowed defendant's petition for certiorari to review the soundness of that decision.

Defendant vigorously argues that *Insurance Co. v. Assurance Co.*, 259 N.C. 485, 131 S.E. 2d 36 (1963), applies to this case and precludes subrogation. That case involved an action for declaratory judgment to determine the respective liabilities of two insurance companies which had issued separate policies insuring a building against fire loss. The appellant's policy covered the mortgagee's interest while the appellee's policy covered the interest of the mortgagor. The premiums which the mortgagee paid to the appellant were charged to the mortgagor and became a part of the total debt owed the mortgagee. The building was subsequently destroyed by fire and the appellant claimed it was subrogated to the rights of the mortgagee against the mortgagor for the amount of the fire loss. The trial court apportioned the loss between the two insurance companies and this Court affirmed, holding that when insurance is procured by the mortgagee pursuant to the authorization and at the expense of the mortgagor no right of subrogation exists and the amount paid by the insurer must be applied to reduce or discharge the mortgagor's obligation to the mortgagee. The rationale of that case is that since the policy with the appellant had been purchased by the mortgagee (the named insured) *acting under the authority and at the expense of the mortgagor,* the proceeds of that policy must be applied to the mortgagor's debt without right of subrogation. That conclusion is sound, but the underlyling facts distinguish that case from the one before us.

The plaintiff in this case issued the blanket policy to B-WAC several years prior to the time defendant and B-WAC executed the security agreement containing the insurance provision upon which defendant relies. That insurance provision reads as follows:

"Debtor agrees to hold the chattels in which a security interest is given at Debtor's risk and to carry insurance for full value with extended coverage upon the same, in such companies as are mutually satisfactory and to provide endorsements upon all such policies of insurance providing that the loss, if any, shall be payable to you and Debtor as their interests may appear. If Debtor fails to provide insurance, *you may do so,* and any payment so advanced

shall be additional indebtedness owed by Debtor to you and secured hereunder." (Emphasis added.)

This provision means that B-WAC was authorized but not required to purchase additional insurance for the full value of the chattels when defendant failed to do so. The provision anticipates the *future* purchase of insurance by B-WAC if, and only if, defendant fails to insure the goods. The provision certainly does not contemplate defendant's liability for a portion of the premiums on B-WAC's *preexisting* blanket policy which was in effect several years prior to execution of the financing agreement. Thus B-WAC was not authorized by the financing agreement, and had no right, to charge defendant with a portion of the premiums B-WAC had paid plaintiff on the blanket policy; and no attempt was made to do so. When B-WAC purchased the blanket policy it was not acting under the authority of or at the expense of the defendant. This distinguishes the present case from *Insurance Co. v. Assurance Co., supra,* and *Buckner v. Insurance Co.,* 209 N.C. 640, 184 S.E. 520 (1936), relied upon by defendant.

Defendant further argues that the reasoning advanced by the Supreme Judicial Court of Massachusetts in *Eastern Restaurant Equipment Co. v. Tecci,* 347 Mass. 148, 196 N.E. 2d 869 (1964), should be applied to this case. There, the Massachusetts Court held that the blanket insurer who paid the fire losses of a vendor under a conditional sales contract was not subrogated to the rights of the vendor against purchasers under the sales contract. In reaching that result the Court explicitly stated that its decision did not rest upon "general grounds" but was narrowly confined to facts *which established the purchasers' liability for the insurance premiums* and "the absence of any showing that the policy required subrogation of the insurer" to the vendor's rights against the purchasers. It follows therefore that the Massachusetts case is distinguishable since, in the case before us, the facts show that (1) defendant incurred no liability under the security agreement for premiums on the blanket policy and (2) the policy expressly provides for subrogation. *See* Vance, Handbook on the Law of Insurance § 130 at p. 775 (3d Ed. Anderson 1951).

[1]  Here, the blanket policy provides that the insurance it affords "shall be considered as excess insurance, and shall not apply or contribute to the payment of any loss until the amount of such other insurance shall have been exhausted . . . . " Sec-

tion C of the blanket policy, which deals with dealer floor plans and is applicable to this case, further limits coverage to "the interest of the Assured [B-WAC] only in merchandise consisting principally of appliances in which the Assured has an interest under a conditional sales agreement, chattel mortgage or other similar form of encumbrance." Moreover, Section C expressly preserves plaintiff's right of subrogation as follows:

> "Payment for loss or damage covered hereunder will be advanced by the company, not exceeding the amount of the unpaid balance except that no claim shall attach under this insurance where the value of the salvage equals or exceeds the amount of the unpaid balance due on the property. Upon making any advance, the company shall thereupon become subrogated to all rights of recovery by the Assured, but, only (1) to the extent of any other valid or collectible insurance in effect at the time of the loss, or, (2) where there is no valid or collectible insurance and the Assured has not waived rights of subrogation either prior to or after the occurrence of any loss covered by this policy."

We note that the trial court found that insurance carried by defendant was insufficient "to cover any of the merchandise" involved in this action. This finding can only mean that defendant had no insurance against loss by fire on any of the property in which B-WAC had an interest. Thus it clearly appears that the blanket policy limits plaintiff's liability to B-WAC to that portion of the loss which is not covered by other insurance and expressly provides for subrogation (1) to the extent of other insurance; or, (2) if other insurance does not exist, to all rights of recovery which B-WAC may have against defendant. The limitation of liability and preservation of subrogation rights obviously minimize the premium charges for the blanket policy which was specifically designed and rated to provide excess insurance protection for those operating B-WAC type businesses. B-WAC purchased the policy with its own funds for its own protection. In our opinion it was never contemplated by any party that the financing agreement or trust receipts would destroy plaintiff's right to subrogation under the blanket policy. We think the facts bring this case within the established rule that when a mortgagee purchases insurance with his own funds solely for his own protection, the insurer, upon payment of the mortgagee's loss as provided in the policy, is subrogated to the rights of the mortgagee against the mortgagor. *Insurance*

*Co. v. Assurance Co., supra; Batts v. Sullivan*, 182 N.C. 129, 108 S.E. 511 (1921); *Insurance Co. v. Reid*, 171 N.C. 513, 88 S.E. 779 (1916); *see also ABC Supermarket, Inc. v. American Employers Insurance Co.*, 283 Ala. 13, 214 So. 2d 291 (1968); *American Equitable Assurance Co. v. Newman*, 132 Mont. 63, 313 P. 2d 1023 (1957). Accordingly, we hold that plaintiff is subrogated to the rights of B-WAC against defendant to the extent it compensated B-WAC under the blanket policy for security interests held by B-WAC in property lost in the fire.

The trial court's Finding of Fact No. 19 merely quotes the "INTEREST AND PROPERTY INSURED" provision from Section C-II of the blanket policy dealing with dual interest coverage of dealer floor plans but does not attempt to apply Section C-II in this case. The words "effective May 1, 1970" appear on the face of the quoted provision and clearly show that Section C-II is inapplicable to this case since the fire occurred more than a year prior to the effective date. The only provision of the blanket policy which could apply is Section C quoted in part above and from which the trial court applied the subrogation provision set out in its Finding of Fact No. 19. Since Section C is the only applicable provision and since it supports the trial court's legal conclusion that plaintiff is subrogated to the rights of B-WAC, the mere quoting of Section C-II in Finding of Fact No. 19 is entirely harmless. *Rhodes v. Upholstery Co.*, 197 N.C. 673, 150 S.E. 193 (1929).

Having determined plaintiff's right of subrogation, we now turn to plaintiff's assignments of error in which it is asserted that the Court of Appeals improperly remanded this case for a new trial.

Defendant contends that plaintiff failed to offer in evidence the subrogation receipt it received from B-WAC for $12,745.01. Hence, defendant argues there is no evidence in the record to show that plaintiff actually paid B-WAC the amount it now seeks to recover in this action. The Court of Appeals so held and remanded the case for a new trial. That ruling is the basis for plaintiff's first assignment of error.

The subrogation receipt is plaintiff's Exhibit 6 and the record shows the following exchange concerning the exhibit

during the examination of Robert H. Daughtry, Manager of B-WAC's Greensboro office:

"Q. Mr. Daughtry, do you know what Plaintiff's Exhibit 6 is?

A. Yes sir.

Q. What is it?

A. It is a Subrogation Receipt to Home Insurance Company.

Q. Upon receipt by B-W Acceptance Corporation of the $12,745.01 payment by Home Insurance Company—

   OBJECTION AND MOTION TO STRIKE

THE COURT: It speaks for itself."

The record does not reflect that plaintiff formally offered Exhibit 6 in evidence after the above response by the trial court.

On 19 March 1974 plaintiff's counsel filed an affidavit alleging that failure of the record to include Exhibit 6 was occasioned by clerical error on the part of the court reporter. In his order of 29 March 1974 settling the case on appeal, Judge Clark stated that he "did consider plaintiff's Exhibit 6 as having been introduced in evidence."

[2]   The rule is well settled that in a trial without a jury, as here, the rules of evidence governing the admission and exclusion of evidence are not so strictly enforced as in a jury trial. *Mayberry v. Insurance Co.,* 264 N.C. 658, 142 S.E. 2d 626 (1965) ; *McCallum v. Insurance Co.,* 262 N.C. 375, 137 S.E. 2d 164 (1964) ; *Bizzell v. Bizzell,* 247 N.C. 590, 101 S.E. 2d 668, *cert. denied,* 358 U.S. 888, 3 L.Ed. 2d 115, 79 S.Ct. 129 (1958). The record indicates that Judge Clark thought the subrogation receipt was competent to "speak for itself" and that he in fact considered the receipt in reaching his judgment. The record discloses no facts tending to show that the exhibit was incompetent. The only legitimate inferences to be drawn are that either plaintiff's Exhibit 6 was tendered and omitted from the record by clerical error or that plaintiff's counsel inadvertently failed to make a formal tender. In either case, we decline to hold a technical oversight constitutes reversible error when its correction would not produce a different result. *Equipment Co. v. Anders,* 265 N.C. 393, 144 S.E. 2d 252 (1965) ; *Bizzell v. Bizzell, supra; Johnson v. Heath,* 240 N.C. 255, 81 S.E. 2d 657

(1954). Judge Clark considered the subrogation receipt as having been offered in evidence, and so do we. Plaintiff's first assignment of error is therefore sustained.

Defendant contends that plaintiff's evidence concerning the nature and value of merchandise destroyed by fire and covered by plaintiff's blanket policy with B-WAC is insufficient to support the findings of the trial judge on that point.

To prove the value of merchandise destroyed in which B-WAC had a security interest, plaintiff offered various trust receipts prepared by B-WAC in the ordinary course of business from invoices of floor-planning items shipped to defendant by the distributor. The invoices showed the items sold, the quantity, and the price of each item. One column on the trust receipts contained the items taken from the invoices. An adjoining column headed "Release Amount" contained the amounts defendant owed B-WAC on each item. In another column headed "Date of Release" an employee of B-WAC would enter the date of payment when defendant sold an item and paid B-WAC for it and would draw a line through the model and serial number of the item released, thereby indicating that the released item was no longer subject to the security agreement. The evidence further tends to show that B-WAC made monthly physical inventories by model and serial number of all floor-planning merchandise to determine if the dealer actually had the merchandise in inventory and was paying for it as he sold it. Defendant's store was inventoried the latter part of February 1969.

Over defendant's objections plaintiff made out its claim for $12,745.01 by showing the items listed on each trust receipt (B-WAC's wholesale floor plan sheet) that had not been released and lined out by B-WAC. The Court of Appeals held that the trust receipts were admissible in evidence but were insufficient, standing alone, to prove that the chattels which had not been "released" were destroyed by fire and to prove their value. The reasoning was that some of the chattels might have been sold immediately before the fire without time for defendant to remit payment to B-WAC or that some of the chattels may have been removed from defendant's building prior to the fire. Since the trust receipts would not reflect such transactions, the Court of Appeals was persuaded that the trust receipts were insufficient to establish the fire loss. Plaintiff's second assignment of error is grounded on that holding. We now examine the validity of that assignment.

[3]  Plaintiff's blanket policy covered B-WAC's interest in merchandise received by defendant under the floor-planning arrangement. Plaintiff insured B-WAC's interest in this merchandise against loss by fire and other perils enumerated in the policy. If B-WAC's security interest in an item was lost other than by an insured peril, *e.g.*, due to a sale in the ordinary course of business or due to removal from the building, then B-WAC would have no claim against plaintiff under the policy and plaintiff would have no right of subrogation for any amount paid to B-WAC under the mistaken belief that the item had been destroyed by fire or other insured peril. Therefore, it was incumbent on plaintiff to offer evidence at trial which would permit the fact finder (judge or jury) to legitimately infer the nature and value of the merchandise destroyed in the fire and covered by the blanket policy with B-WAC. In our opinion the trust receipts were sufficient for this purpose.

Fire loss can seldom be established with absolute certainty. Oftentimes the jury must rely on circumstantial evidence which logically aids the formation of a correct estimate of property loss. When, as here, a recent inventory is available, one accepted method of estimating fire loss is to supplement that inventory with evidence of the amount of goods placed in the store and the amount removed from the store between the time of the inventory and the date of the fire. *Berkshire Mutual Insurance Co. v. Moffett,* 378 F. 2d 1007 (5th Cir. 1967) ; *Worcester Mutual Fire Insurance Co. v. Eisenberg,* 147 So. 2d 575 (Fla. App. 1962) ; *Association of Credit Men v. Insurance Co.,* 44 Idaho 491, 258 P. 362 (1927) ; *Williams v. Southern Mutual Insurance Co.,* 312 Pa. 114, 166 A. 582 (1933) ; *DiFoggi v. Commercial Union Assurance Co.,* 83 Pa. Super. 518 (1924) ; *St. Paul Fire and Marine Insurance Co. v. Stell,* 20 S.W. 2d 399 (Tex. Civ. App. 1929) ; *see* 21 Appleman, Insurance Law and Practice § 12402 (1947) ; 19 Couch, Cyclopedia of Insurance Law § 79 :231 (2d Ed. Anderson 1968).

The trust receipts list all floor-planning items which the distributor shipped to defendant prior to the fire, and the evidence tends to show that B-WAC conducted a physical inventory of the items each month. This permits the reasonable inference that defendant received all items listed on the trust receipts and placed them in its inventory prior to the fire. Furthermore, the trust receipts reflect those items which were sold by defendant and released from the floor-planning agreement. In effect, the

Insurance Co. v. Tire Co.

system used here maintained a continuing inventory of the floor-planning merchandise held by defendant so that the only items that could possibly be unaccounted for at the time of the fire were items which might have been sold immediately before the fire and not released by B-WAC because payment had not been received from defendant, and items which possibly could have been removed, by theft or otherwise, from defendant's building during the period from B-WAC's last physical inventory to the time of the fire. These remote possibilities, however, do not affect the sufficiency of the information contained on the trust receipts to carry the case to the jury. Defendant agreed in the financing agreement to display the floor-planning merchandise at its place of business and not to use it in any other way without B-WAC's consent. Defendant further agreed to pay for the merchandise as it was sold. Defendant had sole possession and control of the merchandise at the time of the fire. As between the parties to this suit, only defendant's records (which were apparently destroyed in the fire) and the knowledge of defendant's employees could account for sales immediately before the fire or for other removal of merchandise from the building. Under such circumstances, if part of the property, ostensibly destroyed by fire, had been recently sold or otherwise removed from defendant's store, then defendant is the party having peculiar knowledge of such facts and therefore the better means of proving it. *Jordan v. Storage Co.*, 266 N.C. 156, 146 S.E. 2d 43 (1966) ; *Joyce v. Sell*, 233 N.C. 585, 64 S.E. 2d 837 (1951) ; *Ange v. Woodmen*, 173 N.C. 33, 91 S.E. 586 (1917) ; *Cook v. Guirkin*, 119 N.C. 13, 25 S.E. 715 (1896) ; *see* 2 Stansbury's North Carolina Evidence § 208 (Brandis Rev. 1973). Since no evidence was offered tending to impair the correctness of the information contained on the trust receipts, the trial judge was entitled to draw the legitimate inference that the trust receipts correctly reflected the inventory on hand and the value of B-WAC's security interest therein at the time of the fire. Therefore, plaintiff's second assignment of error must be sustained.

For the reasons stated the decision of the Court of Appeals is reversed with directions that the case be certified to the Superior Court of Durham County for reinstatement of the judgment of the trial court in accordance with this opinion.

Reversed.