FREDERICK W. LEWIS, JR. AND JANE B. LEWIS v. CAROLINA SQUIRE, INC.
AND ROBERT F. WARWICK

No. 875DC683

(Filed 18 October 1988)

**Contracts § 12.2— sale of map distribution business—cap on amount to be earned by seller—definition of cap ambiguous—parol evidence properly considered**

> Where plaintiffs sold their map distribution business to defendants and the sales contract limited the amount of sales plaintiffs could make in the final four months of owning the business, the trial court properly considered parol evidence and found, as defendants contended, that the $115,045.55 cap on "orders placed" was to be based on the final invoice to a customer, which included costs for artwork, preparation, advertising, shipping, taxes, and overruns, rather than on the original customer orders, since that interpretation would allow the parties to know on the day the business changed hands exactly how much of the four months sales receipts plaintiffs could keep and how much would go to defendants; plaintiffs admitted that they knew that the figure for the cap was taken from their "sales receipt journal" for the same four-month period one year earlier, and the "sales receipt journal" reflected gross sales rather than original invoice amounts; the contract itself referred to "the total gross amount of such sales contracts, agreements or purchase orders (hereinafter designated as 'orders placed'),'' thus suggesting the parties' intent to use the customer's final invoice as the basis to determine orders placed; and the contract provided that orders not delivered to customers by a date almost three months after closing were to be transferred totally to defendants, which allowed for the time lag between order and shipment, thus indicating an intent to use final invoices to set the cap.

APPEAL by plaintiffs from *Rice, Charles E., III, Judge.* Judgment entered 18 March 1987 in District Court, NEW HANOVER County. Heard in the Court of Appeals 11 December 1987.

*Shipman and Lea by Gary K. Shipman for plaintiff appellants.*

*Marshall, Williams, Gorham and Brawley by Lonnie B. Williams for defendant appellees.*

COZORT, Judge.

Plaintiffs sold their map distribution business to defendants. The sales contract limited the amount of sales plaintiffs could make in the final four months of owning the business. Plaintiffs sued defendants, alleging defendants withheld payments due plaintiffs for map sales made before the business changed hands.

Defendants counterclaimed, alleging plaintiffs collected more map sales receipts than the contract to sell the business permitted. After a trial without a jury, the trial court interpreted the contract in favor of defendants and awarded judgment for defendants for $15,519.21. Plaintiffs appeal, contending primarily (1) that the trial court erred in receiving parol evidence to interpret the contract, and (2) that the court's findings of fact are not supported by the evidence. We affirm.

Plaintiffs were the exclusive North Carolina distributor for Champion folding maps manufactured by Champion Map Corporation. Plaintiffs sold custom printed maps in large quantities to banks, real estate companies, chambers of commerce and other customers throughout North Carolina and in certain counties in Virginia and South Carolina. The sales contract provided for a quantity of maps at a unit cost. The sales contract also provided for overruns or underruns not exceeding 10% of the quantity originally ordered. Overruns of ten percent almost always occurred.

After taking an order, plaintiffs did the artwork and prepared the copy for delivery to Champion. Champion manufactured a proof copy and sent it to the customer for approval. After the customer's approval, Champion shipped the quantity ordered, plus any overrun. The cycle between placing the order and shipment of the maps was usually forty-five to sixty days. The original sales contract did not accurately reflect the amount finally invoiced to the customer because the charges for artwork, preparation, and advertising were not known until the order was shipped from Champion. Shipping and taxes were also added to the customer's final bill.

In 1981, defendants began negotiating with plaintiffs to buy plaintiffs' business. A scheduled closing date for the sale was set for 4 January 1982. Defendants were concerned that plaintiffs would "sell out" the territory in the final months of 1981 before closing on the transaction. Many of plaintiffs' customers ordered maps every other year, and fall was the busiest time. Plaintiffs wanted a clean, smooth break from the business. To satisfy both concerns, the parties agreed to cap the amount of sales plaintiffs could make in the final four months of 1981. The pertinent contract provisions provided:

6. *Assignment and Transfer of Existing Contracts, Agreements or Purchase Orders:*

(a) As of the date of closing, by written instrument determined to be appropriate by Buyer's attorneys, Sellers shall assign, convey, transfer and set over unto Buyer all of Sellers [*sic*] right, title and interest in and to all existing contracts, agreements and purchase orders, whether written or oral, made and entered into by Sellers with Champion Map Corporation and with all of Sellers' customers which are executory in nature at the time of closing prior prior [*sic*] to the date of closing, subject, however, to the provisions of subparts (b) and (c) of this paragraph 6.

(b) As to all sales contracts, agreements or purchase orders entered into by Sellers with any customer prior to December 31, 1981, Sellers shall retain all right, title, interest and obligation in, under and to such orders placed by Sellers subject to the following two conditions.

(1) If the total gross amount of such sales contracts, agreements or purchase orders (hereinafter designated as "orders placed") for the period beginning September 1, 1981, and ending December 31, 1981, entered into by Sellers shall exceed the total gross amount of $115,045.55 then, in such event, Sellers shall assign, convey and transfer over unto Buyer all of. Sellers [*sic*] right, title and interest in all "orders placed" in such excess of "orders placed" at the time of closing. As to such excess of "orders placed" which are transferred to Buyer, Buyer shall assume the responsibility for the payment thereof to Champion Map Corporation. At closing Sellers shall provide to Buyer a written accounting of all "orders placed" during the period September 1, 1981, through December 31, 1981.

(2) If delivery of any "order placed" by Sellers, regardless of when it was placed, shall not be completed by March 31, 1982, then, in such event, Sellers, on April 1, 1982, shall transfer, convey, and set over unto Buyer all of their right, title and interest in and to such unfilled orders and Buyer shall pay to Sellers their costs therein, cost meaning the amount paid by Sellers to Champion Map Corporation within five (5) days of the date of collection by Buyer from

the customer; provided, however, if the customer shall fail to take delivery, return the merchandise or refuse to pay, though [sic] no fault of Buyer, then Buyer shall have no obligation to pay to Sellers.

(c) As to all sales contracts, orders, purchase orders or sales agreements received by Sellers prior to December 31, 1981, the Buyer shall become the agent of Sellers for the purpose of administering such sales contracts, orders, purchase orders or sales agreements to completion. Buyer shall use its good faith efforts to see that all such sales contracts are completed by proper delivery and that payment for same is appropriately made; however Buyer shall not be responsible to Sellers for any amounts not collected or not paid by any customer. After the date of closing Sellers shall have no further business dealings with any of Sellers [sic] customers except as may be specifically approved by Buyer in advance. As to any funds collected by Buyer for Seller under the terms of this paragraph 6, Buyer shall remit same to Sellers within ten (10) days of receipt by Buyer.

(d) Sellers shall pay in full to Champion Map Corporation when due the cost of all orders taken by Sellers for merchandise ordered by customers. As to any of such orders place [sic] by Sellers prior to December 31, 1981, which, under the terms of this paragraph 6 may subsequently be transferred to Buyer, Buyer shall only be responsible for reimbursing Sellers the cost thereof to Sellers within five (5) days of payment for any such order placed by the customer and if no payment is received by Buyer from customer then Buyer shall have no obligation to reimburse Sellers for such order placed.

(e) Executory in nature as used in subpart (a) of this paragraph 6 shall mean those purchase orders or sales made by Sellers prior to the date of closing but for which no delivery of the purchased merchandise has been made, as of the date of closing, to the customer by Sellers or Champion.

After the closing date, a dispute arose concerning the map sales contracts plaintiffs entered into with customers during the last four months of 1981. Plaintiffs contended that defendants had not forwarded to plaintiffs the correct amount of receipts in ac-

cordance with the contract. Defendants contended that plaintiffs had sold more than the $115,045.55 cap provided in paragraph 6.(b)(1) of the contract and that plaintiffs had already collected more receipts than they were allowed under the contract. The crux of the dispute, boiled down to its simplest form, is whether the $115,045.55 cap on "orders placed" was to be based (1) on the original customer orders, without the cost of artwork, preparation, advertising, shipping, taxes, and overruns, as plaintiffs contended; or (2) on the final invoice to a customer, which included costs for artwork, preparation, advertising, shipping, taxes and overruns, as defendants contended. Much correspondence between plaintiffs and defendants brought them no closer to a resolution of the dispute. Finally, on 31 December 1984, plaintiffs filed suit, alleging among other things, that defendants owed plaintiffs $7,911.75 in customer payments made on orders placed during the last four months of 1981. In their answer, defendants denied owing plaintiffs any sum. Defendants also counterclaimed, alleging plaintiffs owed defendants because plaintiffs exceeded the cap and collected more receipts than that amount to which they were entitled. In a nonjury trial, the court rendered judgment for defendants and awarded damages of $15,519.21, plus interest from 28 May 1982. Plaintiffs appeal.

In their first assignment of error plaintiffs contend that the trial judge's findings of fact were not supported by the evidence. Plaintiffs argue generally that the evidence does not support findings which interpret the contract to place a cap on the gross amount of invoices ultimately submitted to customers. Specifically, plaintiffs object to the following findings:

3. In order to protect themselves, the defendants required and plaintiffs agreed that the total sales which the plaintiffs would be entitled to receive during the period September 1, 1981 through December 31, 1981, would not exceed the total sales as shown in plaintiffs' journal during the period September 1, 1980 through December 31, 1980. All sales over that amount would belong to defendants.

4. Defendants computed the total sales recorded in plaintiffs' cash or sales journal for the period September 1, 1980 through December 31, 1980, to be $115,045.55, PLAINTIFFS' EXHIBIT 4. That figure represented the total receipts from

sales made during the four month period including overruns, customized art work, freight charges and sales tax, and plaintiffs knew what the figure computed by defendants represented.

\* \* \*

8. From the language of the Contract it was the intention of the parties that "Orders placed" as defined in the Contract meant the total sales amount resulting from all orders received during the four month period as determined upon completion and delivery by the invoices of such sales.

The standard of review for findings of fact in nonjury trials is limited. The findings have "the force and effect of a verdict by a jury and are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *Williams v. Pilot Life Ins. Co.*, 288 N.C. 338, 342, 218 S.E. 2d 368, 371 (1975).

Plaintiffs and defendants offered evidence of what the term "orders placed" represented in the contract. Plaintiff Frederick B. Lewis testified that the $115,045.55 cap was directed at the original sales contract figures, not the later gross invoice figures, which would allow plaintiffs and defendants to know on 4 January 1982, the day the business changed hands, exactly how much of the September-December 1981 sales receipts plaintiffs could keep and how much would go to defendants. Plaintiff Lewis thought defendant Robert F. Warwick agreed with that interpretation at the time. Plaintiff Lewis testified that the cap referred to the amounts as reflected on the purchase orders on the date the order was initiated by the customer. He admitted on cross-examination that the contract did not make that specific statement. He also admitted on cross-examination that he knew that the figure for the cap—$115,045.55—was taken from his "sales receipt journal" for the period September through December 1980. The "sales receipt journal" reflected "gross sales" and not just original invoice amounts.

Defendant Warwick testified that he and plaintiff Lewis agreed to use the four months of plaintiffs' "sales" from the previous year as the cap. They added up the sales figures from the sales journal and came up with $115,045.55. Warwick testified

that the language in the contract—"sales contracts, agreements or purchase orders"—was intentionally broad to cover final invoices and any other type of agreement between plaintiffs and map customers to cover *all* sales for that period of time. They were trying to identify the four month "gross sales" figure, not just the "orders placed" figure. Defendant Warwick further testified that they used the figures from the sales journal to establish the cap because they were dealing specifically with gross sales. He testified that Lewis agreed at the time that the cap was based on gross sales and that Lewis later changed his opinion.

We believe there is support in the evidence for the findings made by the trial court and the interpretation of the contract made by the trial court. There is evidence to support the interpretation urged by plaintiffs; however, it was the trial court's duty as finder of fact to resolve the conflicts in the evidence.

We find further support for the trial court's findings by analyzing carefully the words in the contract provisions in dispute.

The definition of "orders placed" in the contract suggests that the parties intended to use the final amount invoiced to the customer to determine the amount of sales. Referring to "orders placed," the contract provided: "the *total gross amount* of such sales contracts, agreements or purchase orders (hereinafter designated as 'orders placed')." (Emphasis added.) The words "total" and "gross" suggest the parties' intent to use the customer's final invoice as the basis to determine orders placed.

The use of plaintiffs' sales journal from the previous year to set the cap supports the trial court's interpretation. Plaintiffs knew the $115,045.55 figure was the total of plaintiffs' "gross sales" for the last four months of 1980 taken from plaintiffs' own cash receipts journal. Plaintiffs' Exhibit 4 broke down the sales for the last four months of 1980 into various columns. Column 1 was captioned "Gross," meaning gross sales. Plaintiff testified that he knew defendants simply added the "Gross" figures from Column 1 for September, October, November, and December, 1980, to arrive at the $115,045.55 cap.

Plaintiffs' restrictive definition of orders placed ignores a key provision of the contract. The contract provided that orders not delivered to customers by 31 March 1982 were to be transferred

totally to defendants. The parties knew the number of maps originally ordered as of the closing date, 4 January 1982. They did not know the customer's final invoice, especially for orders received in December 1981, because the time lag between order and shipment was forty-five to sixty days. The costs of artwork, preparation, and advertising were not fixed until the customer returned an approved copy to Champion. Since the cutoff date allowed for the time lag between order and shipment, and during that time all costs became fixed and were invoiced, there is support for finding the parties intended to use final invoices to set the cap. Otherwise the final cutoff date would have been 4 January 1982 instead of 31 March 1982.

In sum, we find the evidence supports the challenged findings of fact and find no merit to plaintiffs' first assignment of error.

In their second assignment of error, plaintiffs contend the trial judge erred by allowing parol evidence to determine the contract's meaning. In support of this assignment, plaintiffs refer to the trial court's conclusion of law which reads: "2. The language of the contract was clear and unambiguous." We find the court made a nonreversible error in concluding the contract was clear and unambiguous, and we further find the trial court did not err in admitting parol evidence to ascertain the intent of the parties.

When contract language is clear and unambiguous, it should be given effect. *Olive v. Williams*, 42 N.C. App. 380, 383, 257 S.E. 2d 90, 93 (1979). Courts should not under the guise of judicial construction supply key terms omitted by the parties. *Id.* But "[i]f the writing leaves it doubtful or uncertain as to what the agreement was, parol evidence is competent to show and make certain what was the real agreement." *Robinson v. Benton*, 201 N.C. 712, 713, 161 S.E. 208, 209 (1931). We find the term "orders placed" to be ambiguous because the parties did not specify precisely how the number of orders would be calculated in relation to the sales cap. The trial judge was correct in accepting testimony from plaintiffs and defendants to determine what the term meant.

Having found that the trial court correctly accepted parol evidence, we do not find its erroneous conclusion to be reversible error. The harmless error rule stems from a notion of judicial economy: a judgment should not be reversed because of a techni-

cal error which did not affect the outcome at trial. *Whitley v. Richardson,* 267 N.C. 753, 755, 148 S.E. 2d 849, 851 (1966). The test for granting a new trial is whether there is a reasonable probability that at the new trial the result would be different. The burden of proof to show prejudice is on the objecting party. *In re Norris,* 65 N.C. App. 269, 274, 310 S.E. 2d 25, 29 (1983), *cert. denied,* 310 N.C. 744, 315 S.E. 2d 703 (1984).

We believe there is no reasonable probability of a different result at a new trial. In this nonjury trial, wide discretion was given both parties to put on evidence. Both plaintiffs and defendants availed themselves of that opportunity. In spite of the erroneous conclusion of law, we believe the trial judge's result is based on competent evidence and is not faulty as a matter of law.

Finally, plaintiffs have argued that the trial court incorrectly awarded interest in the judgment accruing from 28 May 1982, because no breach of contract by plaintiffs occurred. Having found that the trial court did not err in (1) interpreting the contract in defendants' favor and (2) awarding damages to defendants under the contract, we find no merit to this argument. We find 28 May 1982 to be the correct date to begin interest computation because that is the approximate date plaintiffs should have made payments to defendants.

Judgment for defendants is affirmed.

Judges BECTON and EAGLES concur.