JOSEPHINE BURRELL, Plaintiff v. SPARKKLES RECONSTRUCTION COMPANY, BRIDGEWATER GROUP, INC., and PIEDMONT MUTUAL INSURANCE COMPANY, Defendants

No. COA07-494

(Filed 4 March 2008)

**1. Judgments— consent and directed verdict—technical error—outcome unchanged**

Entry of a consent judgment for plaintiff on damages was affirmed, despite the court's technical error in granting directed verdict for defendants, because the court's error did not affect the outcome.

## 2. Damages and Remedies— breach of insurance contract— mold and water damage

The correct amount was awarded for damages for breach of an insurance contract arising from damage to a residence from water and mold where defendant insurer stipulated to an amount for water damage repairs without contradiction from plaintiff, and the court allowed the policy limit for mold damage, less an amount already paid for hotel expenses.

## 3. Insurance— mold damage—alleged slow settlement—not proximate cause

Any slow response to mold damage by an insurance company was not the proximate cause of the damages, and the trial court did not err by granting summary judgment for defendant insurance company.

## 4. Witnesses— expert—insurance adjustor—no additional information

The refusal to allow an insurance adjustor to testify as an expert was not an abuse of discretion by the trial court. The witness was not planning to give any additional information or facts that would assist the trier of fact; rather, he essentially would have substituted his judgment about the meaning of the facts for that of the jury and the court.

Appeal by plaintiff from order and judgment entered 13 October 2006 by Judge Narley L. Cashwell in Superior Court, Wake County. Heard in the Court of Appeals 13 November 2007.

*Lewis & Roberts, PLLC, by Daniel K. Bryson and Geoffrey S. Proud, for plaintiff-appellant.*

*Hunton & Williams LLP, by Steven B. Epstein and Edward Avery Wyatt, for defendants-appellees.*

WYNN, Judge.

Plaintiff Josephine Burrell appeals from an order granting a directed verdict to Defendants Piedmont Insurance and Bridgewater Group on her claims for breach of contract and unfair and deceptive trade practices, as well as the amount of a monetary judgment entered in her favor. After a careful review of the record and the issues before us, we conclude that the trial court technically erred by entering a directed verdict against Ms. Burrell on her claim for breach

of contract; however, we affirm the ultimate disposition of the trial court to award her damages for that breach.

Upon returning to her home on the evening of 5 July 2003, Ms. Burrell found it flooded by hundreds of gallons of water due to a ruptured toilet valve on the second floor. Ms. Burrell called the fire department for assistance and contacted Sparkkles Restoration Services, an emergency water remediation company, to extract the water and dehumidify the house.

On 7 July 2003, Ms. Burrell reported the damage and loss to her homeowner's insurer, Piedmont Insurance Company. Piedmont assigned the claim to an independent adjusting company, Bridgewater Group, Inc. On 8 July 2003, Bridgewater's adjuster, David Barber, investigated the claim along with Randy Baker, President of Sparkkles. Ms. Burrell received a scope of work prepared by Mr. Barber on 21 July 2003, estimating the cost of repairs as $10,448.03, not including mold remediation.

On 10 July 2003, Sparkkles abandoned its incomplete work, leaving ceilings, floors, and walls in Ms. Burrell's house open and unfinished. A week later, Ms. Burrell hired Elliot Tatum of Insight Inspection Services to inspect her home, at which point he discovered mold in the HVAC system. Concerned about her health, Ms. Burrell went to a doctor and checked into a hotel. The next day, she informed Mr. Barber of Bridgewater that mold had been discovered and that she moved out of her home because she had become ill. Mr. Barber informed her that Piedmont would begin paying for her additional living expenses, and he then retained Cary Reconstruction Company (CRC) to inspect the house for mold; that inspection took place on 21 July 2003.

Thereafter, Ms. Burrell discovered that Sparkkles and CRC were respectively owned by two brothers. Concerned as to their impartiality, Ms. Burrell refused to allow CRC personnel to enter her home when Mr. Barber sent them back to the house for a reinspection on 31 July 2003. Nevertheless, CRC provided Ms. Burrell with a copy of its initial 21 July report indicating the presence of mold in her home. Upon Piedmont's request, CRC also prepared a mold remediation estimate in the amount of $3,081.52, which was received by Mr. Barber on 15 August 2003, but never sent to Ms. Burrell.

In the meantime, on 28 July 2003, Ms. Burrell hired AfterDisaster, another remediation company, to inspect her home and continue the

BURRELL v. SPARKKLES RECONSTR. CO.

[189 N.C. App. 104 (2008)]

drying process. Mr. Barber agreed to work with AfterDisaster. On 5 August 2003, AfterDisaster submitted a drying and restoration estimate in the amount of $10,149.84 to Mr. Barber, who rejected the estimate and directed AfterDisaster to refer to Ms. Burrell for payment of work already completed.

Mr. Barber sent letters to Ms. Burrell on 31 July 2003 and 7 August 2003, asking her to contact him so further mold inspection could take place. When Ms. Burrell had not responded to either letter by 3 September 2003, Piedmont claims adjuster Jeff Stepp sent her a letter stating that her file would be closed and a payment would be issued for all undisputed claims if she did not reply within ten days. On 6 October 2003, Piedmont sent Ms. Burrell a check in the amount of $1,012.37, for her hotel stay immediately following the flooding of her house. On 26 October 2003, CRC reinspected Ms. Burrell's home with an independent Certified Industrial Hygienist, finding elevated mold levels and thus recommending extensive mold remediation. Piedmont offered Ms. Burrell approximately $13,000 in February 2004 to resolve her claim; she rejected the offer, stating that it was insufficient to cover the damages she had incurred.

On 16 July 2004, Ms. Burrell brought an action asserting eight claims against Sparkkles, Bridgewater, and Piedmont. Before the jury trial, Ms. Burrell voluntarily dismissed all her claims, except for a breach of contract claim against Piedmont and an unfair and deceptive trade practices claim against Piedmont and Bridgewater. At the close of Ms. Burrell's evidence, Piedmont and Bridgewater moved for a directed verdict. On 13 October 2006, the trial court entered an order granting a directed verdict to Piedmont and Bridgewater on Ms. Burrell's remaining claims, and entering a consent judgment in favor of Ms. Burrell in the amount of $14,435.66 against Piedmont.

Ms. Burrell now appeals, arguing that the trial court erred by: (I) granting a directed verdict on the breach of contract claim; (II) granting a directed verdict on the unfair and deceptive trade practices claim; and (III) excluding the testimony of Donald L. Dinsmore.[1]

---

1. We note in passing that Ms. Burrell's brief to this Court states that she filed a notice of arrangement for the transcript on 26 October 2006, pursuant to Rule 7 of our appellate rules, but the record does not contain a copy of this notice. Moreover, according to Defendants' brief, the transcript was not delivered until 28 February 2007. Nevertheless, Defendants have not argued that any prejudice resulted from this omission or delay; moreover, both parties received extensions of time to prepare their briefs to this Court, which would have mitigated any problems resulting from the delayed transcript. We see no reason these technical rules violations would impede our understanding of the issues on appeal.

I.

**[1]** First, Ms. Burrell argues that the trial court erred by granting directed verdict on the breach of contract claim and entering judgment in her favor for $14,435.66. We agree in part and disagree in part.

At the outset, we note that Piedmont and Bridgewater conceded at oral arguments before this Court that there was, in fact, a breach of contract in Piedmont's failure to pay Ms. Burrell's claim following the flooding of her house. Specifically, appellate counsel for Piedmont and Bridgewater stated, "We have no problem . . . accepting that there was a breach of contract [and restricting our argument to] what were the damages." When asked if he was telling the Court that his clients stipulated to a breach of contract, "so the only issue now is the question of the Chapter 58 damages," appellate counsel responded, "That's fine, your Honor." Thus, the parties agree that the trial court erred by entering a directed verdict in favor of Piedmont and Bridgewater on Ms. Burrell's breach of contract claim.

However, we conclude that this technical error did not affect the outcome of the trial because the trial court also entered judgment ordering Piedmont to pay $14,435.66 in damages to Ms. Burrell for a breach of contract. Thus, the error does not require reversal or a new trial. *See Phillips v. Phillips*, 185 N.C. App. 238, 244, 647 S.E.2d 481, 486 (2007) ("Thus, the court's finding of a stipulation is a technical error which does not affect the outcome of the order and, therefore, does not require reversal."), *aff'd per curiam*, 362 N.C. 171, 655 S.E.2d 350 (2008); *see also Home Ins. Co. v. Ingold Tire Co.*, 286 N.C. 282, 290, 210 S.E.2d 414, 420 (1974) ("[W]e decline to hold a technical oversight constitutes reversible error when its correction would not produce a different result."); *Lewis v. Carolina Squire, Inc.*, 91 N.C. App. 588, 595-96, 372 S.E.2d 882, 887 (1988) ("The harmless error rule stems from a notion of judicial economy: a judgment should not be reversed because of a technical error which did not affect the outcome at trial." (citation omitted)). Here, regardless of the entry of a directed verdict against her for breach of contract, the outcome of the trial was ultimately the same for Ms. Burrell: namely, damages from that breach of contract. As such, we will consider Ms. Burrell's challenge to the adequacy of the amount of the damages awarded by the trial court.

**[2]** In general, damages in a breach of contract action attempt to place the injured party, insofar as possible, in the position she would

have been in had the contract been performed. *Strader v. Sunstates Corp.*, 129 N.C. App. 562, 571-72, 500 S.E.2d 752, 757, *disc. review denied,* 349 N.C. 240, 514 S.E.2d 274 (1998). Thus, when an insurance company breaches its policy with an insured party, the damages owed to the insured are the amount of coverage due under the express terms of the policy itself. Moreover, as established by our Supreme Court, "the language of the [insurance] policy controls" its interpretation. *Nationwide Mut. Ins. Co. v. Mabe,* 115 N.C. App. 193, 198, 444 S.E.2d 664, 667 (1994), *aff'd,* 342 N.C. 482, 467 S.E.2d 34 (1996). "The various terms of an insurance policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect." *Cone Mills Corp. v. Allstate Ins. Co.,* 114 N.C. App. 684, 690, 443 S.E.2d 357, 361 (1994), *disc. review improvidently allowed,* 340 N.C. 353, 457 S.E.2d 300 (1995). Furthermore,

> Where the language of a contract is plain and unambiguous, construction of the agreement is a matter of law; and the court may not ignore or delete any of its provisions, nor insert words into it, but must construe the contract as written, in light of the undisputed evidence as to the custom, usage and meaning of its terms.

*Id.* (emphasis, quotation, and citation omitted).

Here, although Ms. Burrell's actual insurance policy with Piedmont was never entered into evidence at trial, there was extensive testimony as to the provisions and coverage under the policy, including the mold endorsement included in the policy. The mold endorsement specifically stated that it applied "even if the wet rot, dry rot, bacterium or fungus results from or is aggravated by a loss that may be covered by this policy," including "the accidental discharge of liquids." Most importantly, the endorsement provided a limit of five thousand dollars in payment for the total of all losses and costs from incidental wet rot, dry rot, bacteria, and fungi damage, regardless of the number of locations or number of claims made.

The sole evidence offered at trial as to the water damage repairs fixed that amount at a maximum of $10,448.03, per the initial estimate and scope of work prepared by Mr. Barber. Piedmont stipulated to that amount, and Ms. Burrell did not contradict that amount nor suggest that her direct damages from the water leak were greater than that amount. Rather, Ms. Burrell's evidence focused exclusively on the damages she attributed to the spread of mold in her house, caused by the water leak. She testified that she wanted compensation for the

complete mold remediation of her home, estimated at $42,900, as well as for new ceilings, walls, interior trim, cabinets, HVAC system, duct-work, carpeting, hardwood floors, two Craftmatic beds, and over $88,000 worth of personal property in her home, including furniture and clothing. She further stated that she sought reimbursement for alternate living arrangements in the amount of almost $23,000, hotel expenses totaling nearly three thousand dollars, and $60,000 in med-ical bills related to mold-related injuries, pain, suffering, and emo-tional distress. Ms. Burrell also admitted that Piedmont had previ-ously paid her $1,012.37 for hotel expenses incurred when she moved out of her house due to the mold.

Under the clear and express terms of the mold endorsement in Ms. Burrell's policy, Piedmont's liability for the mold damages was capped at five thousand dollars. Notwithstanding Ms. Burrell's asser-tions that Piedmont did not explain the provisions of the endorse-ment to her or mention it in any of the correspondence that followed the water leak, neither did Piedmont misrepresent the terms of the coverage or attempt to deny she had some mold coverage. As the insured party, Ms. Burrell had a responsibility to read her own policy; moreover, she was bound by the terms of the contract just as Piedmont was. We see no reason—nor did Ms. Burrell present evi-dence at trial—why the language of the mold endorsement should not control here. See Mabe, 115 N.C. App. at 198, 444 S.E.2d at 667. Thus, even were we to accept all of Ms. Burrell's evidence as to mold-related damage, her recovery under the insurance policy would be capped at five thousand dollars.

The trial court ordered monetary damages for Ms. Burrell in the amount of $14,435.66, which included the uncontradicted $10,448.03 in water damages and the entire five thousand dollars allowed under the policy for mold damage, less the $1,012.37 Piedmont had already paid to Ms. Burrell for her hotel expenses. Again, Piedmont con-sented at trial to the amount of this judgment, declining to challenge Ms. Burrell's recovery of the full five thousand dollars allowed. As such, we find the trial court entered damages in an amount sufficient to fully compensate Ms. Burrell as if the insurance policy had not been breached, the correct amount as a matter of law. Strader, 129 N.C. App. at 571-72, 500 S.E.2d at 757. We further conclude that the nature and amount of the evidence were such that the trial court was not required to make findings of fact as to the amount of damages. Accordingly, we affirm the trial court's entry of judgment in favor of Ms. Burrell in the amount of $14,435.66.

II.

[3] Ms. Burrell next argues that the trial court erred by granting directed verdict on her unfair and deceptive trade practices claim because there was sufficient evidence for submission to the jury. We disagree.

Although claims of unfair or deceptive trade practices are generally brought under N.C. Gen. Stat. § 75-1.1, if such practices occur in the insurance industry, they are instead governed by N.C. Gen. Stat. § 58-63-15 and, if proven, deemed to be violations of Chapter 75 as a matter of law. *Miller v. Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 302, 435 S.E.2d 537, 542 (1993), *disc. review denied*, 335 N.C. 770, 442 S.E.2d 519 (1994); *see also Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 10, 472 S.E.2d 358, 363 (1996) ("N.C. Gen. Stat. 58-63-15(11) enumerates a list of practices which are, as a matter of law, instances of unfair and deceptive conduct." (citation omitted)), *disc. review denied*, 345 N.C. 344, 483 S.E.2d 173 (1997).

Moreover, "[t]o prevail on a claim for unfair and deceptive trade practices, one must show: (1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business." *Miller*, 112 N.C. App. at 301, 435 S.E.2d at 542 (citation omitted). However, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (citation omitted), *disc. review denied*, 332 N.C. 482, 421 S.E.2d 350 (1992). Substantial aggravating circumstances must attend a breach of contract to permit recovery as an unfair or deceptive trade practice. *Id.*

In the instant case, Ms. Burrell contends that Piedmont and Bridgewater committed six unfair settlement practices, causing damage to her by allowing the mold problem in her home to go unremediated and become more severe. We find this argument to be unpersuasive. Even assuming *arguendo* that Piedmont and Bridgewater did, in fact, engage in these alleged unfair settlement practices, prior precedent of this Court prevents Ms. Burrell from proving that those violations caused her injury.

In *Nelson v. Hartford Underwriters Insurance Company*, this Court considered a case in which insured plaintiffs argued that their insurance company had exacerbated their mold problems from water

leaks by misrepresenting their coverage and delaying investigation and payment of their claim. 177 N.C. App. 595, 608, 630 S.E.2d 221, 230-31 (2006). Like here, the plaintiffs in *Nelson* claimed the insurance company had committed unfair settlement practices that "slowed their remediation" of the mold damage in their home. *Id.*, 630 S.E.2d at 231. Although the time period at issue in *Nelson* was five years, much longer than what is implicated here, we find that difference to be irrelevant to the question of causation. Specifically, as we noted in *Nelson*:

> Keeping in mind the ongoing injury from mold contamination, [the insurance company's] actions are related to the *response* by the parties to the injury. A response to an injury is, by its nature, not the cause of the injury itself; the injury happens first, and the response to the injury follows. The response is thus not the cause of the injury, but rather a reaction to it. . . . Furthermore, plaintiffs suffered no new injury from [the insurance company's] actions. Instead, plaintiffs' ongoing mold contamination simply proceeded unabated, as a continuation of the already-existing injury.

*Id.* at 613, 630 S.E.2d at 234. Even more significantly:

> Plaintiffs also contend that [the insurance company's] actions harmed them by slowing their remediation of the home. This argument similarly fails, however, because remediation is the response to the injury. Even if [the insurance company's] actions slowed the remediation, those actions slowed only the response to the injury, and did not cause the injury itself. *A lack of abatement of an injury is not equivalent to causing the injury itself.* In any case, none of [the insurance company's] actions prevented plaintiffs from eliminating the mold from their home, regardless of the type of mold.

*Id.* at 613-14, 630 S.E.2d at 234 (emphasis added).

This holding—that an insurance company's slow response to mold damage is not the proximate cause of the damage itself—is squarely on point and is therefore binding on other panels of this Court. *See In re Appeal From Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court."). Ms. Burrell offered no evidence at trial to

suggest that Piedmont and Bridgewater were the "but for" cause of the mold damage to her home. Indeed, she stated on cross-examination that the mold was caused by the water leak, and its spread and severity were due in part to the "botched job" done by Sparkkles in the days immediately following the leak. Accordingly, even considering the evidence in the light most favorable to Ms. Burrell, we find that she failed to prove an element of her unfair and deceptive trade practices claim as a matter of law. *See Herring v. Food Lion, LLC*, 175 N.C. App. 22, 26, 623 S.E.2d 281, 284 (2005) (stating the standard of review of a directed verdict), *aff'd per curiam*, 360 N.C. 472, 628 S.E.2d 761 (2006). This assignment of error is therefore overruled.

## III.

**[4]** In her final assignment of error, Ms. Burrell argues that the trial court erred by excluding the testimony of Donald L. Dinsmore, Jr., tendered by Ms. Burrell as an expert witness at trial. We disagree.

Rule 702 of our Rules of Evidence provides, in pertinent part: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C. Gen. Stat. § 8C-1, Rule 702(a) (2005). Our Supreme Court has further adopted a three-part test for trial courts evaluating the admissibility of expert testimony under Rule 702: "(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citing *State v. Goode*, 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-41 (1995)). We review a trial court's ruling as to the admissibility of an expert witness's testimony for an abuse of discretion. *Id.*

In the instant case, there was an extended *voir dire* examination at trial of Donald Dinsmore, Jr., to establish him as an expert in the field of insurance claims and the proper adjustment of water damage and mold claims. Mr. Dinsmore repeatedly stated his opinion that, based on his review of the file, relevant documents, and interviews with Ms. Burrell, Piedmont and Bridgewater had engaged in conduct that violated statutory law, particularly in the way they responded to and handled her claim. Counsel for both Ms. Burrell and Piedmont provided case law and argument to the trial court as to why Mr. Dunsmore's testimony should be allowed or excluded, respectively;

however, Ms. Burrell's attorney did not offer any case that directly stood for the proposition that insurance adjusters could testify as experts. Moreover, the *voir dire* testimony by Mr. Dunsmore suggests that he would have offered legal conclusions based on the same facts and documents that had been put into evidence and would be reviewed by the trial court and jury. As noted by both defense counsel and the trial court, Mr. Dinsmore was not planning to give any additional information or facts that would "assist the trier of fact to understand the evidence or to determine a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 702(a). Rather, he would essentially have been substituting his judgment of the meaning of the facts of the case for that of the jury and trial court.

At the conclusion of *voir dire*, the trial court stated:

The Court finds and concludes, in the Court's discretion, that those opinions will not assist the triers of fact in understanding the evidence or determining a fact in issue, and that those opinions would invade the province of the Court in determining whether legal standards have or have not been met.

Further, the Court determines that the opinions of the witness are not relevant, and if the opinions are irrelevant, the probative value of said opinions are [sic] substantially outweighed by the danger of confusing of the issues in this case and of misleading the jury.

The Court finds and concludes that the objection of the defendant to the testimony of Mr. Dinsmore should be sustained, and it is hereby sustained.

Based on the substance of Mr. Dinsmore's *voir dire* testimony, and the trial court's thoughtful consideration of the arguments presented by counsel for both parties, we see no abuse of discretion in this ruling. This assignment of error is accordingly overruled.

Affirmed.

Judges STEELMAN and GEER concur.